UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

| | |
|---|---|
| UNITED STATES OF AMERICA | Crim. No. 2012 JUN 28 P 2: 14<br>3:12cr146 (WWE)<br>U.S. DISTRICT COURT<br>VIOLATIONS: BRIDGEPORT, CONN |
| v. | 22 U.S.C. Sections 2778(b)(2), 2778(c) |
| | 22 C.F.R. Sections 127.1(a), 127.3 |
| | 22 C.F.R. Sections 126.1(a) and (e) |
| UNITED TECHNOLOGIES CORPORATION,<br>PRATT & WHITNEY CANADA CORP.,<br>AND HAMILTON SUNDSTRAND<br>CORPORATION | 18 U.S.C. Section 1001 |
| | 18 U.S.C. Section 2 |

INFORMATION

The United States Attorney charges:

GENERAL ALLEGATIONS

1. At all times material to this Information, United Technologies Corporation ("UTC") was and is a Delaware corporation with offices and headquarters located in Connecticut. UTC is a publicly traded corporation, the common stock of which is listed on the New York Stock Exchange. UTC researches, develops and manufactures high-technology products in numerous areas, including aircraft engines, helicopters, HVAC, fuel cells, elevators and escalators, fire and security, building systems and industrial products. UTC is also a large defense contractor, producing missile systems and military helicopters. For 2011, UTC reported net sales of $58.190 billion and $5.374 billion in net income.

2. At all times material to this Information, Hamilton Sundstrand Corporation ("HSC"), a wholly owned subsidiary of UTC, was and is a Delaware corporation with offices and headquarters located in Connecticut. HSC designs and manufactures technologically advanced aerospace and industrial products and produces aircraft systems for both commercial and military aircraft. Examples of HSC's aerospace products include electric power generating, distribution, management and control systems; engine control systems; primary and secondary flight controls

and actuation systems; propeller systems; and electronic controls and components. For 2011, HSC reported net sales of $6.15 billion and $1.08 billion in operating profits.

3. At all times material to this Information, Pratt & Whitney Canada Corp. ("PWC"), a wholly owned subsidiary of UTC, was and is a Canadian aircraft engine manufacturer with headquarters in Longueuil, Quebec. PWC researches, develops, manufactures and markets aircraft engines. PWC has produced more than 73,000 engines, of which there are currently more than 47,000 engines in service on over 25,000 aircraft operated by some 10,000 operators in 198 countries.

4. At all times material to this Information, the China Aviation Industry Corporation ("AVIC") was and is a state-owned company and consortium of aircraft manufacturers in China that focuses on the aviation industry, both military and civilian. On July 1, 1999, the consortium was split into "AVIC I" and "AVIC II." AVIC I was mainly focused on large planes, while AVIC II was mainly focused on smaller planes, small passenger airliners, medium-range transport aircraft and helicopters. In October 2008, AVIC I and AVIC II officially consolidated back into one organization to manage resources more efficiently and to avoid redundant projects. Although AVIC seeks to compete with private, Western companies in the civilian airline industry, the major focus of AVIC is, and has been, to efficiently develop indigenous military technologies.

5. At all times material to this Information, the China National Aero-Technology Import & Export Corporation ("CATIC"), established in 1979, has been owned by AVIC. CATIC is a large-scale, state-owned trading corporation in China with its core business being the import and export of aviation defense products.

The United States Arms Embargo with China

6. In February 1990, following the events that took place in June 1989 in Tiananmen Square, the United States Congress, in Public Law No. 101-246, imposed a prohibition upon licenses or approvals for the export of defense articles to the People's Republic of China ("PRC").

7. Congress imposed that prohibition upon the transfer of defense articles, including military helicopters and their parts, unless and until the President reports to Congress that China had "made progress on a program of political reform" or that "the national interest of the United States" required termination of the prohibition against transfers of munitions and related technology. Pub. L. No. 101-246, Section 902. For more than twenty years, no President has so reported. To the contrary, each President since 1990 has acted through the International Traffic in Arms Regulations ("ITAR") to maintain a prohibition upon arms, war materials and military technology being provided or sold to China. Accordingly, that general prohibition was in place during the relevant time period for the conduct involved in this matter from 2000 through 2006 and remains in place today, as noted in the ITAR, 22 C.F.R. Section 126.1.

<u>PWC's Involvement with the Chinese Z10 Military Attack Helicopter</u>

8. At all times material to this Information, the Z10 helicopter was and is the first dedicated modern military attack helicopter developed by the PRC. For several decades, the PRC sought to develop a dedicated military attack helicopter, after determining that civilian helicopters converted for military use were not adequate in a military attack role. Although efforts by the PRC to develop a dedicated military attack helicopter began in the 1980s, the PRC's efforts to import foreign designs either failed or were canceled, particularly following the Tiananmen Square protests of 1989 and the resulting arms embargoes with China. Beginning in the 1990s, the PRC therefore sought to develop its attack helicopter under the guise of a civilian medium helicopter development program, through which the PRC was able to secure significant Western technical assistance.

9. The Z10 military attack helicopter was developed by AVIC II's Changhe Aircraft Industries Group ("CAIG") and AVIC II's China Helicopter Research and Development Institute ("CHRDI"), with the assistance of Western suppliers retained by AVIC II's CATIC, including PWC.

10. During the development phase of the program, each Z10 military attack helicopter was powered by two PWC PT6C-67C turboshaft engines. PWC delivered ten of these development engines to China. Two of the ten development engines were used in China on a ground test rig; six engines were used on three flight test aircraft; and the remaining two engines were used as spare development engines.

11. PWC's development engines were identical to the PT6C-67C engines that PWC was already supplying for a commercial helicopter. As a result, PWC determined that the engines themselves, including the Electronic Engine Control hardware in those engines, did not constitute "defense articles" requiring an export license under the ITAR. However, because the Electronic Engine Control software ("EEC software") used to test and operate those engines was modified to interface with a military helicopter application, the modified EEC software did constitute a defense article and did require an export license from the Department of State, which was never sought or obtained. The EEC software was provided by HSC. Versions of the EEC software were exported by HSC to PWC in Canada and exported by PWC to China, where they were downloaded for use in the ten development engines. Specifically, between January 2002 and October 2003, HSC delivered versions of the EEC software to PWC in Canada twelve times. PWC subsequently exported six of those twelve software versions to China. On four occasions between November 2004 and June 2005, PWC also exported to China versions of HSC's EEC software that PWC modified on its own.

12. From the inception of the project, PWC knew that the PRC was developing a military attack helicopter, for which U.S-sourced components would be prohibited. PWC also recognized that the Chinese Z10 project raised export compliance issues both in Canada and the United States, yet they failed to share those concerns, or their knowledge regarding the development of the attack helicopter, with UTC or HSC until years later. Instead, PWC knowingly turned a blind eye to the attack helicopter application and went along with the "sudden appearance" of a parallel civil program, the existence of which PWC openly questioned as "real or imagined," in order to facilitate PWC's obtaining Canadian export licenses for the engines and the EEC software from HSC, a U.S.-based UTC subsidiary.

13. PWC believed that the Z10 project provided a substantial financial opportunity for the company. According to a November 2005 purchase contract between CATIC and PWC that was executed after the ten development engines had been delivered and after HSC had left the program, CATIC agreed to purchase sixty production engines from PWC at a cost of $475,000 per engine, for a total of $28,500,000. In an export application subsequently submitted to the Canadian government in support of this contract, PWC sought a permit to export 120 of the engines to China, 110 of which were to be used as production engines for the military version of the helicopter, and ten of which were to be used as developmental engines in support of the development of the civil version. In the application, PWC stated that it was "on the brink of reaping the benefits of our investment" in the military version of the helicopter. In addition, according to PWC briefing materials regarding company projects and the helicopter market in China, it was anticipated that work on the Z10 program would open the door to what was anticipated to be a more lucrative civil helicopter market in China. According to PWC market estimates, potential sales and revenues for PWC for civil helicopter sales and service over the life of the project ranged from $500 million to over $2 billion.

14. Based on representations from PWC, HSC believed that it was providing its EEC software for a civil, non-military Chinese Medium Helicopter ("CMH") that was either civil or dual-use in nature. Accordingly, HSC internally classified the software as an item controlled by the U.S. Department of Commerce and exported it to PWC as "NLR" (no license required).

15. On January 28, 2004, HSC requested an end-use statement for the Z10 program from PWC.

16. On February 6, 2004, PWC forwarded an end-use statement to HSC regarding the CMH development program. It stated that the Z10 military version was the lead development program, that the military version would be the first application, and determined that, as a result, HSC could not supply the EEC software without a license from the State Department. HSC stopped work on the Z10 program on February 13, 2004.

17. In May 2004, a briefing for a senior executive of UTC regarding projects in China, including the Z10, noted that a "[t]wo seat military version has flown first." The briefing added that the program was a "major breakthrough for P&WC" as it had broken the dominance of a major competitor in "the Chinese helicopter engine market." The briefing expressly stated that PWC "took a calculated risk in competing and winning the CMH . . . program[]" and acknowledged that, "[b]ecause of military applications, risks do exist on export control issues." The briefing also stated that "[t]hese risks have been mitigated by obtaining the necessary export permits and through appropriate selection of suppliers for engine components."

18. After Pratt & Whitney's Vice President of Government Business Development in UTC's Washington, D.C. office reviewed the May 2004 briefing paper, he emailed two executive-level lawyers with substantial experience in and responsibility for export-control matters in Pratt & Whitney East Hartford's legal department. That email stated: "I would say that the '2 seat version' is code for an attack helicopter." The email continued: "this has the possibility to be very controversial and I'm sure [the UTC senior executive] will want to be sure this has all the appropriate government approvals."

19. In late 2004 and early 2005, PWC had extensive discussions regarding the Z10 program with the UTC official in Government Business Development in UTC's Washington, D.C. office.

20. In May 2005, an export specialist in UTC's Washington, D.C. office asked PWC about U.S. origin content in the Z10. Specifically, in a May 13, 2005 email bearing the subject "Export control/embargo," an export specialist at UTC's Washington headquarters asked PWC to identify the U.S. suppliers and U.S. content for the engines, and whether the U.S. suppliers knew, at the time they exported materials to Canada, that the ultimate destination of the engines was China. PWC responded, in pertinent part, "we have procured the EEC from [HSC] for the Agusta [AB139] applications and for a limited number [of] development engines for the Z10. The only difference is that we have installed new software for the Z10 EECs."

21. Notwithstanding HSC's stop work order and the awareness of the export violations, PWC continued on its own to modify the previously supplied HSC EEC software and to export those versions to China through and including June 21, 2005.

## The Disclosures

22. UTC, PWC and HSC failed to disclose the export violations for several years. In February 2006, UTC's investor relations department received an email inquiry entitled "Investor analysis of UTC's activities in China," from an institutional investor that described itself as a non-governmental organization offering advice to investors on what it believed to be socially responsible investments. The inquiry questioned PWC's participation in the development of the Chinese Z10 combat helicopter in light of the United States' arms embargo with China and stated: "[W]e are carrying out in-depth research into the nature and degree of the involvement of your company . . . and that such research might result in a recommendation to divest from your company." At the time, UTC personnel were in the process of preparing briefing materials for a UTC senior executive for an April annual shareholders meeting. One of the issues included in the briefing materials was the investor inquiry, and more generally, PWC's supplying engines to China for its helicopter programs. The shareholder inquiry triggered an internal review that ultimately led to the decision to make a disclosure.

23. An initial disclosure letter dated July 17, 2006 was submitted to the United States Department of State's Office of Defense Trade Controls Compliance in the Directorate of Defense Trade Controls ("DDTC"), with two follow-up submissions dated August 11, 2006 and September 6, 2006. In the 2006 disclosures, UTC, PWC and HSC falsely claimed that: (1) the Z10 program was "first represented" to PWC as a dual-use helicopter platform where civil and military applications would be developed in parallel; (2) from the inception of the Z10 program in 2000, PRC representatives advised PWC that the Z10 program was a common helicopter program from which both civil and military variants would be developed in parallel utilizing a common platform; and (3) PWC only learned several years into the project that the military

-7-

version of the helicopter was the lead version, which they learned for the first time, by happenstance, in March 2003, when certain PWC engineers walked through a hangar in China and saw the Z10 attack helicopter prototype.

24. In fact, representatives from CATIC and AVIC II initially told PWC that the first application was military and that the civil version would follow at some undetermined future date. Contemporaneous PWC documents confirmed that certain PWC employees believed that the first application would be military. For example, in an internal August 2000 e-mail, a PWC marketing employee wrote to PWC employees that "[d]iscussions on [the PWC engine] for [the] Chinese Z-10 attack helicopter are progressing smoothly." It was only later, when PWC informed AVIC II that an export permit would be needed for a military-first program, that CATIC produced a briefing paper on the civil program and said that it was being developed in parallel with the military program. In an internal November 2000 email to PWC employees, PWC's own marketing personnel questioned the "sudden appearance" of the civil program, questioned whether the timing was "real or imagined," and expressed concern "that it may have been put together to aid approval of [the] export license." PWC turned a blind eye to those doubts and consciously avoided further inquiry, choosing instead to proceed on the basis of the revised description of the CMH program as a common platform with civil and military versions being developed in parallel.

25. By the time the disclosures were submitted to the State Department, employees of HSC and a UTC division who were working on the disclosures had become aware that the statements concerning PWC's understanding at the inception of the program were not accurate.

### The Chinese Z10 Military Attack Helicopter Today

26. Although UTC, PWC and HSC are no longer involved in the program, the Z10 military attack helicopter is now in production, with initial batches delivered to the People's Liberation Army of China ("PLA") in 2009 and 2010.

27. The primary mission of the Z10 military attack helicopter is anti-armor and battlefield interdiction, but it also has some limited air-to-air combat capabilities.

28. The Z10 military attack helicopter has a standard gunship configuration with a narrow fuselage and stepped tandem cockpits. The gunner is seated at the front, and the pilot is seated at the rear. Weapons of the Z10 have included 30-mm cannons, anti-tank guided missiles, air-to-air missiles and unguided rockets.

29. The defense industry was generally aware that the PRC has sought to develop and design military equipment, such as the Z10 military attack helicopter, with significant technical assistance from Western suppliers, arms embargoes with China notwithstanding. For example, an April 2005 article in *Jane's Defence Weekly* not only highlighted the involvement of Western suppliers in assisting the Chinese in their development of the military attack helicopter, but it also described how secrecy surrounding Chinese production of military equipment had allowed Western companies to hide the extent of their assistance and involvement. The article stated that "[t]he intense secrecy that surrounds the Z-10 is probably driven by the involvement of Western firms who have provided much technical assistance." *Jane's* stated that "[u]nder the guise of CHRDI's parallel Chinese Medium Helicopter . . . project, often referred to as the six-ton[] helicopter," China was able to buy skills and technology "that is being routed directly into a military program[]." *See* "China's Z-10 Helicopter Built on Western Expertise," Robert Hewson, *Jane's Defence Weekly*, April 13, 2005.

## COUNT ONE

(Willful Violation of the Arms Export Control Act,
Export of Defense Articles Without a License,
Against PWC Only)

30. The allegations set forth in paragraphs 1 through 29 of this Information are hereby re-alleged and incorporated as though set forth in full herein.

31. From approximately January 2002 to October 2003, Pratt & Whitney Canada Corp. ("PWC"), the defendant herein, knowingly and willfully caused Hamilton Sundstrand Corporation ("HSC") to export from the United States, and caused to be exported to the People's Republic of China, defense articles, that is, technical data in the form of HSC software to test and operate the Electronic Engine Control for certain PWC helicopter engines that were used in the development of a Chinese Z10 military attack helicopter, without having obtained from the Department of State a license or written authorization for such exports.

In violation of Title 22, United States Code, Sections 2778(b)(2) and 2778(c), Title 18, United States Code, Section 2, and Title 22, Code of Federal Regulations, Sections 127.1(a) and 127.3.

## COUNT TWO

(False Statements to the United States Department of State
Against UTC, HSC and PWC)

32. The allegations set forth in paragraphs 1 through 29 of this Information are hereby re-alleged and incorporated as though set forth in full herein.

33. From approximately July 2006 to September 2006, United Technologies Corporation ("UTC"), Pratt & Whitney Canada Corp. ("PWC") and Hamilton Sundstrand Corporation ("HSC"), the defendants herein, knowingly and willfully made and caused to be made materially false, fictitious and fraudulent statements in certain disclosures, in a matter within the jurisdiction of a department or agency of the United States, knowing the same to contain such materially false, fictitious and fraudulent statements, namely, by submitting disclosures, on July 17, 2006 and September 6, 2006 to the United States Department of State's Office of Defense Trade Controls Compliance in the Directorate of Defense Trade Controls, which stated:

    (1)    that the Chinese Z10 helicopter program was first represented to PWC as a dual-use helicopter platform where civil and military applications would be developed in parallel, but as it unfolded, the Chinese Medium Helicopter became a military attack helicopter platform with a civil helicopter platform to follow;

(2) that from the inception of the Z10 program in 2000, representatives from the China Aviation Industry Corporation II ("AVIC II") and the China National Aero-Technology Import & Export Corporation ("CATIC") in the People's Republic of China advised PWC that the Z10 program was a common helicopter program from which both civil and military variants would be developed in parallel utilizing a common platform; and

(3) that PWC only learned several years into the project that the military version of the helicopter was the lead version, which they learned for the first time, by happenstance, in March 2003, when certain PWC engineers walked through a hangar in China and saw the Z10 military attack helicopter prototype for the first time;

while UTC, PWC and HSC knew and were in possession of materials demonstrating that PWC personnel knew, at the project's inception in 2000, that the Z10 program involved a military attack helicopter.

All in violation of Title 18, United States Code, Section 1001.

### COUNT THREE

(Willful Failure to Timely Inform the Directorate of Defense Trade Controls of the
Export of Defense Articles Without a License to an Embargoed Nation
Against PWC and HSC)

34. The allegations set forth in paragraphs 1 through 29 of this Information are hereby re-alleged and incorporated as though set forth in full herein.

35. The defendant, Pratt and Whitney Canada Corp. ("PWC"), from at least 2002 to July 2006, and the defendant, Hamilton Sundstrand Corporation ("HSC"), from at least 2004 to July 2006, did knowingly and willfully fail to timely inform the United States Department of State's Office of Defense Trade Controls Compliance in the Directorate of Defense Trade Controls of an actual sale and transfer to a country with which the United States maintains an arms embargo,

that is, the People's Republic of China, of defense articles and technical data, that is, HSC software to test and operate the Electronic Engine Control ("EEC") for certain PWC helicopter engines that were used in the development of a Chinese Z10 military attack helicopter, while knowing and having reason to know that such actual sale and transfer were made without having obtained from the United States Department of State a license or written authorization for such exports.

In violation of Title 22, United States Code, Section 2778(c) and Title 22, Code of Federal Regulations, Sections 126.1(a) and (e).

## FORFEITURE ALLEGATION

In committing the felony offense alleged in Count One of the Information, PWC shall forfeit to the United States of America, pursuant to 18 United States Code, Section 981(a)(1)(C), as authorized by 28 United States Code, Section 2461(c), any property, real or personal, that constitutes or is derived from proceeds traceable to the offense alleged in Count One of the Information, without regard to the type of interest held, wherever located and in whatever name held. The property to be forfeited to the United States shall be the following:

> <u>Money Judgment</u>. Two million, three hundred thousand dollars ($2,300,000) in United States currency, in that such sum in the aggregate constitutes or is derived from proceeds traceable to the offense set forth in Count One.

If any of the above-described forfeitable property, as a result of any act or omission of the defendant, cannot be located upon the exercise of due diligence, has been transferred, sold to or deposited with a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value or has been commingled with other property that cannot be divided without difficulty, it is the intent of the United States, pursuant to 21 United States Code, Section 853(p), as incorporated by 28 United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above.

All in accordance with Title 18, United States Code, Section 981(a)(1) as incorporated by Title 28, United States Code, Section 2461(c), and Rule 32.2(a), Federal Rules of Criminal Procedure.

UNITED STATES OF AMERICA

DAVID B. FEIN
UNITED STATES ATTORNEY

MICHAEL J. GUSTAFSON
ASSISTANT UNITED STATES ATTORNEY

STEPHEN B. REYNOLDS
ASSISTANT UNITED STATES ATTORNEY