# Deferred Prosecution Agreement

FILED

1. United Technologies Corporation ("UTC"), Hamilton Sundstrand Corporation ("HSC") and Pratt & Whitney Canada Corp. ("PWC"), hereinafter collectively referred to as the "UTC Entities," by their undersigned attorneys and pursuant to authority granted by their Boards of Directors, on the one hand, and the United States of America, by and through the United States Attorney's Office for the District of Connecticut (the "Office") and the United States Department of Justice, National Security Division ("NSD") on the other hand, enter into this Deferred Prosecution Agreement (the "Agreement"). This Deferred Prosecution Agreement and the plea agreement between the Office and PWC are connected to, and conditioned upon, the contemporaneous resolution of the related matters with the United States Department of State's Office of Defense Trade Controls Compliance in the Directorate of Defense Trade Controls ("DDTC"). Except as specifically provided below, the Agreement shall be in effect for a period of two years from the filing date of the Information described in paragraph 2 of this Agreement (the "Deferral Period").

2. The Office has informed the UTC Entities that it will file, on or shortly after the date that the Agreement is fully executed (the "Execution Date"), a three-count Information in the United States District Court for the District of Connecticut, charging:

(a)    From approximately January 2002 to October 2003, the defendant, PWC, knowingly and willfully caused HSC to export from the United States, and caused to be exported to the People's Republic of China, defense articles, that is, technical data in the form of HSC software to test and operate the Electronic Engine Control ("EEC") for certain PWC helicopter engines that were used in the development of a Chinese Z10 attack helicopter, without having first obtained from the United States Department of State a license or written authorization for such exports, in violation of Title 22, United States Code, Sections 2778(b)(2) and 2778(c), Title 18, United States Code, Section 2, and Title 22, Code of Federal Regulations, Sections 127.1(a) and 127.3.

(b)    From approximately July 2006 to September 2006, the defendant UTC Entities knowingly and willfully made and caused to be made materially false, fictitious and fraudulent statements in certain disclosures, in a matter within the jurisdiction of a department or agency of the United States, knowing the same to contain such materially false, fictitious and fraudulent statements namely, by submitting disclosures, on July 17, 2006 and September 6, 2006 to DDTC, which stated:

     (1)    that the Z10 program was first represented to PWC as a dual-use helicopter platform where civil and military applications would be developed in parallel, but as it unfolded, the CMH became a military attack helicopter platform with a civil helicopter platform to follow;

     (2)    that from the inception of the Z10 program in 2000, representatives from the China Aviation Industry Corporation II ("AVIC II") and the China National Aero-Technology Import & Export Corporation ("CATIC") in the People's Republic of China advised PWC that the Z10 program was a common helicopter program from which both civil and military variants would be developed in parallel utilizing a common platform; and

(3)     that PWC only learned several years into the project that the military version of the helicopter was the lead version, which they learned for the first time, by happenstance, in March 2003, when certain PWC engineers walked through a hangar in China and saw the Z10 attack helicopter prototype.

while UTC, PWC and HSC knew and were in possession of materials demonstrating that PWC personnel knew, at the project's inception in 2000, that the Z10 program involved a military helicopter;

All in violation of Title 18, United States Code, Section 1001.[1]

(c)     The defendant, Pratt and Whitney Canada Corp., from at least 2002 to July 2006, and the defendant, Hamilton Sundstrand Corporation, from at least 2004 to July 2006, did knowingly and willfully fail to timely inform DDTC of an actual sale and transfer to a country with which the United States maintains an arms embargo, namely, the People's Republic of China, of defense articles and technical data, that is, HSC software to test and operate the Electronic Engine Control ("EEC") for certain PWC helicopter engines that were used in the development of a Chinese Z10 military attack helicopter, while knowing and having reason to know that such actual sale and transfer were made without having first obtained from the United States Department of State a license or written authorization for such exports, in violation of Title 22, United States Code, Section 2778(c) and Title 22, Code of Federal Regulations, Sections 126.1(a) and (e).

(d)     A forfeiture allegation, namely that, in committing the felony offense alleged in Count One of the Information, PWC shall forfeit to the United States of America, pursuant to 18 U.S.C. § 981(a)(1)(C), as authorized by 28 U.S.C. § 2461(c), any property, real or personal, that constitutes or is derived from proceeds traceable to the offense alleged in Count One of the Information, without regard to the type of interest held, wherever located and in whatever name held. The parties agree that in satisfaction of the forfeiture allegation, the following property shall be forfeited to the United States:

---

[1] By entering into this Deferred Prosecution Agreement, the UTC Entities expressly acknowledge that, to the extent that venue may be an issue for any particular charge set forth in the Information, they are knowingly, intelligently and voluntarily waiving their right to be prosecuted in a district or districts where venue is proper, and they are knowingly, intelligently and voluntarily consenting to the disposition of this case in the District of Connecticut. Such a waiver of the right to be prosecuted in the state and district where a crime was committed is constitutionally permissible. *See, e.g., Singer v. United States*, 380 U.S. 24, 35 (1965).

Money Judgment. Two million, three hundred thousand dollars ($2,300,000) in United States currency, in that such sum in the aggregate constitutes or is derived from proceeds traceable to the offense set forth in Count One.

If any of the above-described forfeitable property, as a result of any act or omission of the defendant, cannot be located upon the exercise of due diligence, has been transferred, sold to, or deposited with a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property that cannot be divided without difficulty, it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above;

All in accordance with Title 18, United States Code, Section 981(a)(1) as incorporated by Title 28, United States Code, Section § 2461(c), and Rule 32.2(a), Federal Rules of Criminal Procedure.

3. The UTC Entities and the Office agree that, upon the filing of the Information in accordance with the preceding paragraph, this Agreement shall be publicly filed in the United States District Court for the District of Connecticut. The UTC Entities each agree to post the Agreement prominently on their internal websites.

4. In light of the UTC Entities' remedial actions to date, their entry into a separate and independent Consent Agreement with the United States Department of State, and their willingness, as described in this Agreement, to: (a) continue those corrective actions and undertake additional remedial actions; (b) acknowledge responsibility for their behavior; (c) continue their cooperation with the Office and other governmental regulatory agencies; (d) demonstrate their future good conduct and full compliance with export laws and regulations; and (e) consent to payment of the penalties set forth herein, the Office shall recommend to the Court that prosecution of UTC and HSC on Count Two of the Information filed pursuant to paragraph 2, and prosecution of PWC and HSC on Count Three of the Information filed pursuant to paragraph 2, be deferred for a period of two years from the filing date of the Information.[2] If the Court declines to defer prosecution for any reason, this Agreement shall be null and void, and the parties will revert to their pre-Agreement positions.

5. The Office agrees that if, in the sole reasonable discretion of the Office, the Office concludes that the UTC Entities are in full compliance with all of their obligations under this Agreement, the Office, within 30 calendar days after the expiration of the Deferral Period, will file a motion with the Court seeking the dismissal with prejudice of Count Two of the Information as against UTC and HSC, and Count Three of the Information as against PWC and HSC.[3]

---

[2]   UTC and HSC are not named as defendants in Count One of the Information.

[3]   UTC is not named as a defendant in Count Three of the Information.

6. The UTC Entities and the Office agree that the Deferral Period shall be excluded from any speedy trial calculation as a "period of delay during which prosecution is deferred by the attorney for the Government pursuant to a written agreement with the defendant, with the approval of the court, for the purpose of allowing the defendant to demonstrate his good conduct," pursuant to 18 U.S.C. § 3161(h)(2). The UTC Entities further agree not to assert any right to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), or any applicable Local Rules of the United States District Court for the District of Connecticut.

7. The UTC Entities have undertaken extensive reforms and remedial actions in response to the conduct set forth in the statement of facts attached as Appendix A (the "Statement of Facts"). These reforms and remedial actions include the following:

*United Technologies Corporation*

- UTC assigned an Associate General Counsel direct supervisory responsibility for UTC's Corporate International Trade Compliance ("CITC"), and oversight responsibility for export compliance across UTC. This action streamlined and unified the chain of supervision for all export control personnel through the Vice President & General Counsel of each business unit to a UTC senior executive who serves as UTC's senior empowered official under the Arms Export Control Act ("AECA") and the International Traffic in Arms Regulations ("ITAR").

- UTC revised Section 20 of the UTC Corporate Policy Manual ("Compliance with Export Controls and Economic Sanctions") to prescribe detailed standards for business unit export-control programs; to require periodic self-assessment with those standards, annual reviews and independent internal audits; and to prescribe detailed standards to ensure that potential instances of noncompliance are promptly reported, timely and thoroughly investigated, timely, accurately and thoroughly disclosed, and that all remedial corrective actions specified in any disclosure are supported by adequate plans, resources and accountability for timely execution, and that they are tracked to completion and documented as closed.

- UTC established a UTC Export Council, chaired by the Associate General Counsel referenced above and including executive-level and other key export-controls compliance leaders from the Washington Office and the business units to coordinate and implement UTC-wide management initiatives on export controls.

- UTC is periodically reviewing UTC's export controls and economic sanctions compliance posture and issues at meetings of UTC's President's Council, which includes UTC's Chairman, President & CEO, the Presidents of UTC's major business units, and senior corporate staff. The Council is also conducting periodic special topic reviews initiated by UTC's Chairman, President and CEO, which have included focus on improving export controls-related automated systems across the primary ITAR-controlled UTC exporting businesses (Hamilton Sundstrand; Pratt & Whitney, including Pratt & Whitney Canada; and Sikorsky).

- UTC implemented and requires on-demand online training for all employees on export controls. As of March 31, 2012, since 2007, 52,133 employees had completed a module on ITAR compliance related to military products, technology and defense services; and 51,487 had completed a companion module on Export Administration Regulations ("EAR") compliance for "dual-use" and commercial products and technology.

- UTC has devoted significant resources to identifying past ITAR, EAR and Customs violations and has been making disclosures to the Government.[4]

*Pratt & Whitney Canada Corp.*

- PWC expanded its Legal Services Export Compliance ("LSEC") department from two full-time employees to 11 and is currently expanding to 15 employees, including lawyers and specialists with experience in ITAR compliance, including with U.S.-based companies.

- PWC implemented a network of "Business Area Export Representatives" or "BAERs." PWC's BAER network consists of approximately 250 employees dispersed throughout the company who act as the first points of contact for export control compliance issues within the business units. All BAERs receive training from LSEC. In key units, there is a full-time Export Compliance ("EC") Manager, who is often assisted by additional, dedicated full-time BAERs. In other units, each organization has numerous part-time BAERs, who serve as first points of contact for export control issues within their area of specialization.

- PWC retained outside counsel to review and assess potentially high-risk export controls compliance areas within the Company's operations, with a focus on identifying and managing potential compliance issues under the ITAR. PWC has also worked with outside counsel to create and implement numerous business processes and tools to strengthen compliance across the organization.

- PWC conducted a comprehensive review to identify all PWC engines, engine parts and components, and related technical information, subject or potentially subject to ITAR control. PWC and outside counsel analyzed 565 engine models in PWC's nine engine families, and determined which engines should be treated as "military" or "civil" for purposes of compliance with U.S. export laws. In addition, PWC and outside counsel analyzed PWC's library of parts and components to determine which

---

[4] In 2006, UTC filed nine disclosures with the State Department; in 2007 UTC filed 17; in 2008 UTC filed 21; in 2009, UTC filed 35; in 2010, UTC filed 45; and in 2011, UTC filed 35 disclosures to the State Department. As of March 31, 2012, UTC filed an additional five disclosures with the State Department.

of them could fall under the United States Munitions List ("USML") and the jurisdictional reach of ITAR. The results of the classification exercise included not only the implementation of appropriate controls for existing engines and parts, but also the implementation of new procedures to identify, control and license, as necessary, new engines and parts, and related technical data and services.

- PWC implemented significant compliance system enhancements, including: (1) a high-level policy outlining PWC's approach to export compliance; (2) a Program Birth Certificate program that summarizes key facts about the program from an export controls perspective, including the jurisdictional classification of the predecessor engine, customer, intended end-use and technologies involved, and forms the initial basis for the creation of an Export Compliance Plan; and (3) standard work processes to ensure that certain export-related tasks performed in multiple areas of the company are conducted in the same manner, use centralized tools and produce consistent results for, among other things, export classification research, license, permit and agreement application processes.

- PWC implemented a mandate that each new program, including non-ITAR programs, be subject to an Export Compliance Plan ("ECP"), which must be created at the outset, reviewed and updated as the program proceeds through multiple project stages of PWC's "Passport Process." The ECP details the measures each business unit must follow to ensure compliance with applicable export law and regulations, including EAR, ITAR and Canadian controls. Where a program is ITAR-controlled, the ECP incorporates a Technology Control Plan.

- PWC implemented a variety of mechanisms to facilitate employees raising potential export controls compliance issues. These issues are investigated by LSEC using a detailed, time-sensitive procedure and, where violations are found, they are disclosed.

- PWC has dedicated significant resources to efforts to better protect technical information, including ITAR-controlled technical data, and to prevent unauthorized transfers or access of technical data and commodities. An example of these improvements is the implementation of Global Trade Services ("GTS"). The GTS software serves as a centralized repository for the export jurisdiction/classification of commodities and for licenses. In addition to other functionality, GTS uses the license and jurisdiction/classification information to automatically verify export compliance at distinct operational gates. GTS screens transactions for export control requirements each time an SAP transaction is created or modified to procure, sell, or ship a product. GTS verifies whether a license is needed. If a license is needed, GTS verifies whether one is in place (and valid) and blocks the transactions if a license is not in place. GTS also verifies whether the parties in the transaction are sanctioned parties or in an embargoed country, and blocks the transaction as necessary. Additionally, GTS performs these last two screenings regularly against all suppliers, customers, freight forwarders and other parties in its database to proactively block these partners (e.g., before a transaction is contemplated).

PWC's implementation of GTS is ongoing.  For transactions associated with new engines and new spare parts, compliance checks are performed to ensure compliance with Canadian export controls and the U.S. Export Administration Regulations.  It is expected to be configured to perform compliance checks on new engines and new spare parts subject to the ITAR by the end of 2012.  In addition, PWC has begun work to configure GTS to perform the same compliance checks for aftermarket transactions where used engines and parts are being returned to PWC.

- PWC implemented an Enterprise Export Compliance Training Plan, which contains four components: (1) expert training for LSEC employees, EC Managers and members of the BAER network; (2) substantive training for EC Managers and the BAER community, with LSEC providing the mandatory training and EC Managers and BAERs doing so on specific issues relevant to their organizations; (3) job or project specific training; and (4) export awareness training throughout PWC to build familiarity with the prevalence and importance of export control regulations and compliance with mandatory elements using a variety of formats.

- PWC has facilitated frequent, regular audits (e.g., separate audits led by UTC, outside U.S. counsel and the Canadian government).  Additionally, PWC has implemented an enterprise-wide, standard, self-assessment process. Each department, covering all sites, has been rated as high, medium or low risk with respect to activities which invoke export controls.  Self-assessments are conducted on a frequency tied to their risk rating.  Employees at all levels of PWC are engaged in conducting these assessments in which they delve into the details of all business processes with an aim to embed compliance requirements proactively and vigorously.

*Hamilton Sundstrand Corporation*

- HSC substantially expanded its Export Department. HSC assigned a former federal prosecutor with extensive experience as an executive-level leader to its International Trade Compliance ("ITC") group (formerly known as Import/Export Control & Management or IECM).  HSC ITC previously consisted of one manager, six export specialists and one import specialist, six of whom have since left the group by retirement, reorganization or transfer. The ITC group now consists of one executive leader, seven export managers (three of whom are lawyers), seven other export personnel (three of whom are lawyers); and two import specialists (one of whom is a lawyer), and currently has three open positions (two of which will be export managers and one an import specialist).  Four of ITC's members are engineers.

- HSC rebuilt its export coordinator network. The previous network existed largely on paper, comprised of coordinators who were loosely organized and not tasked with substantive assignments. Under the new structure, HSC, like PWC, implemented a system of BAERs, who are responsible for managing export issues for their respective business units, performing classification and export authorization reviews, and providing front-line awareness of export issues in HSC's day-to-day operations.

HSC has approximately 40 full-time and more than 400 part-time BAERs worldwide. Approximately 12 of the full-time BAERs have been appointed as "Worldwide Export Compliance Managers" or "Lead BAERs."

- HSC made significant changes to its export jurisdiction and classification determination process. HSC retained outside counsel to confirm jurisdiction and classification determinations for its active legacy parts within its systems, and to help develop rules for its engineering community to ensure that items are properly classified at their inception.

- HSC implemented a new master "iClass" system to capture information relating to jurisdiction determinations and export classification and to serve as a master repository for jurisdiction and classification data. Specifically, HSC overhauled its IT systems as they pertain to export controls to develop and implement the "iClass" system, which now serves as the master database for the classification of all HSC items, including pre-production items, production hardware, technical data, software, tools and machinery. The system is designed to capture all of the relevant information necessary for a robust compliance program. iClass also feeds jurisdiction and classification data to all of the other IT systems, so that consistent information will be accessible at critical times. iClass is operable as a classification database.

- HSC conducted significant export compliance and awareness training. Among other things, HSC retained outside counsel to conduct multiple two-day training sessions for its BAERs and other personnel. HSC also used outside counsel to provide training on ITAR agreements to personnel throughout HSC who are involved in that process. Extensive additional training has been provided by ITC personnel.

- HSC has devoted significant resources to identifying past ITAR, EAR and Customs violations and has been making disclosures to the Government.[5] ITC's executive leader has been deeply involved in this process, along with two lawyers who are part of the export group. HSC has also relied heavily on outside counsel to conduct investigations and prepare disclosures.

8. The UTC Entities shall maintain and continue to implement: (1) the corrective actions identified in their disclosure letters dated July 17, 2006, September 6, 2006, and February 7, 2007, to DDTC; and (2) the corrective actions and export compliance initiatives referenced above in paragraph 7 and further identified in their letter dated July 16, 2010 to the Office. In addition to the extensive remedial actions already taken to date, the UTC Entities also agree to undertake the additional remedial actions and corporate reforms set forth herein, and pursuant to the separate and

---

[5] In 2006, HSC filed 3 disclosures with the State Department; in 2007 HSC filed 5; in 2008 HSC filed 7; in 2009, HSC filed 11; in 2010, HSC filed 11; and in 2011, HSC filed 16 disclosures to the State Department. As of March 31, 2012, HSC filed an additional two disclosures with the State Department.

independent Consent Agreement with the United States Department of State regarding those areas subject to the AECA and ITAR. Unless otherwise stated, the relevant time period for the obligations set forth in this Agreement, including those referenced in this paragraph, shall be the Deferral Period.

9. The UTC Entities will continue to provide their existing employee reporting mechanisms (Ombudsman / DIALOG, Business Practices Office, and other channels) through which employees can notify, including on a confidential basis, appropriate personnel of any concerns regarding compliance with export laws and regulations.

10. The UTC Entities agree to pay monetary penalties as set forth below.

(a) **Criminal Fine (Plea Agreement).** PWC agrees to pay $4.6 million to the United States Treasury as set forth in the plea agreement between PWC and the Office. The basis for this payment is as follows: Ten development engines supported by the EEC software were actually delivered to China; two of the 10 development engines were used on a ground test version, PT01; six engines were used on each of three flight test aircraft, PT02, PT03 and PT03A; and the remaining two engines were used as spare development engines. The total revenues for the 10 development engines and associated spare parts and support, tooling, technical support for engine installation, operations and maintenance and support of the engines during the flight test program, minus the costs for producing such materials, is reasonably estimated by the parties to be $2 million. PWC subsequently overhauled and repaired one of those engines, resulting in a gross profit from that work reasonably estimated to be $300,000. Accordingly, the total gross gain to PWC is reasonably estimated by the parties to be $2.3 million. Accordingly, the $4.6 million fine represents twice the gross gain to PWC resulting from the offense conduct. *See* 18 U.S.C. §3571(d).

(b) **Special Assessment (Plea Agreement).** PWC is obligated by 18 U.S.C. § 3013 to pay a special assessment of $400 on each count of conviction, for a total of $800.

(c) **Forfeiture of Proceeds (Plea Agreement).** Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), and based on PWC's commission of the illegal acts as charged in Count One of the Information, PWC agrees to forfeit a sum of money in the amount of $2.3 million, which the parties agree represents a reasonable estimate of the total gross profit arising from the conduct set forth in Count One. The parties agree that as a result of this and other conduct set forth in the Statement of Facts attached to the Deferred Prosecution Agreement, the United States may institute a criminal forfeiture action for a $2.3 million money judgment, which is properly subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). Two million, three hundred thousand dollars ($2,300,000) is assessed as a criminal forfeiture penalty for the value of the 10 engines delivered and supported by the EEC software, as a consequence of the conduct that forms the basis of Count One of the Information. PWC agrees that for purposes of this agreement, $2.3 million is equal to the proceeds of illegal actions traceable to violations of 22 U.S.C. § 2778, the violations that form the basis of Count One of the Information and the criminal forfeiture allegation in this case. As set forth in the plea agreement, PWC agrees to make payment in full of the foregoing money judgment forfeiture, as set forth in the plea agreement between PWC and the Office.

**(d) Department of State Monetary Payment.** Pursuant to a separate and independent Consent Agreement that the UTC Entities will enter into with the United States Department of State to resolve a number of outstanding export control issues, including the Z10 matter, UTC has agreed to pay a civil penalty of $55 million to the United States Department of State. Five million dollars ($5,000,000) of the civil penalty will be suspended on the condition that UTC is found, in accordance with the provisions of the Consent Agreement, to have applied at least that amount for pre-Agreement, self-initiated remedial compliance measures. An additional $15 million of the civil penalty will be suspended on the condition that UTC is found, in accordance with the provisions of the Consent Agreement, to have applied at least that amount in post-Agreement authorized remedial compliance costs. A full suspension of the $20 million would result in a net payment of $35 million to the United States Department of State.

**(e) Deferred Prosecution Monetary Penalty.** The UTC Entities also agree to pay a deferred prosecution monetary penalty of $13.8 million. Said penalty shall be paid in full, by wire transfer or check, within 14 days of the sentencing of PWC on the charges set forth in Counts One and Two of the Information.

11. The UTC Entities agree that it is a condition of this Agreement that they will retain and pay for an outside, independent individual or entity (the "Independent Monitor") to monitor the UTC Entities' compliance as set forth in paragraph 12(a) of this Agreement. The individual or entity serving as the Independent Monitor may be the individual or entity serving as the Special Compliance Official ("SCO") under UTC's Consent Agreement with the United States Department of State. The Independent Monitor must be selected consistent with United States Department of Justice policies regarding the selection of monitors. Specifically, the monitor must be selected from a pool of at least three qualified monitor candidates, based on merit. The selection process must, at a minimum, be designed to: (1) select a highly qualified and respected person or entity based on suitability for the assignment and all of the circumstances; (2) avoid potential and actual conflicts of interests; and (3) instill public confidence. The selection of the monitor must also comply with the conflict-of-interest guidelines set forth in 18 U.S.C. § 208 and 5 C.F.R. Part 2635. It shall be a condition of the Independent Monitor's retention that the Independent Monitor is independent of the UTC Entities, that no attorney-client relationship shall be formed between the Independent Monitor and the UTC Entities, and there shall be no limitations on any sharing of information between the Monitor, the Office, and any other United States government departments or agencies. The Independent Monitor shall not have been employed in any prior capacity or previously represented the UTC Entities or any of their subsidiaries, and consistent with the terms of the Consent Agreement between UTC and the United States Department of State, the UTC Entities agree that they will not employ or be affiliated with the Independent Monitor for a period of not less than five years from the date the monitorship required under UTC's Consent Agreement with the United States Department of State is terminated. The proposed Independent Monitor must be submitted to the Department of Justice's Office of the Deputy Attorney General for review and approval before the monitorship is established.

12.  The Independent Monitor shall, consistent with the terms of the Consent Agreement between the UTC Entities and the United States Department of State:

(a)  Monitor the UTC Entities' compliance with this Agreement and with the AECA, the ITAR, the Export Administration Act ("EAA"), the Export Administration Regulations ("EAR") and the International Emergency Economic Powers Act ("IEEPA"); review the UTC Entities' policies and procedures designed to prevent violations of the AECA, ITAR, EAA, EAR and IEEPA; and make recommendations necessary to ensure that the UTC Entities comply with this Agreement and the AECA, ITAR, EAA, EAR and IEEPA.  Responsibility for designing an ethics and compliance program that will prevent such violations shall remain with the UTC Entities, subject to the Independent Monitor's input, evaluation and recommendation.

(b)  Have access to information concerning the compliance policies and procedures of the UTC Entities, and shall reasonably exercise such power and authority and carry out the duties and responsibilities of the Independent Monitor as set forth herein in a manner consistent with the purpose of this Agreement and the separate and independent Consent Agreement between the UTC Entities and the United States Department of State.

(c)  With the understanding that nothing in this Agreement shall be interpreted to compel waiver of any applicable attorney-client privilege or work product protection, have full and complete access to the UTC Entities' personnel, books, records, documents, facilities and technical information relating to compliance with this Agreement and with federal export laws and regulations, including the AECA, ITAR, EAA, EAR and IEEPA, and to the compliance policies and procedures of the UTC Entities.

(d)  Have sufficient staff and resources, as reasonably determined by the Independent Monitor, to effectively monitor the UTC Entities' compliance with this Agreement.

(e)  Have the right to select and hire outside expertise if necessary to effectively monitor the UTC Entities' compliance with this Agreement.

(f)  Monitor the information received by the existing employee reporting mechanisms (Ombudsman / DIALOG, Business Practices Office, and other channels) through which employees can notify, including on a confidential basis, appropriate personnel of any concerns regarding compliance with export laws and regulations, including the AECA, ITAR, EAA, EAR and IEEPA.

(g)  Work with, and as requested by, the United States Department of Justice; the United States Department of Commerce, including the Office of Export Enforcement and the United States Department of State, including DDTC.

(h) Report to the Office as soon as any violations of this Agreement are detected and, on at least a semi-annual basis, report to the Office in writing as to the UTC Entities' compliance with this Agreement and the implementation and effectiveness of the internal controls, reporting, disclosure processes and related export compliance functions of the UTC Entities. These semi-annual reports shall: (1) include conclusions and any recommendations necessary to ensure compliance with this Agreement, the AECA, ITAR, EAA, EAR and IEEPA; (2) state whether the Independent Monitor has encountered any difficulties in executing his or her duties and responsibilities assigned herein; (3) describe any and all instances of non-compliance; and (4) advise on progress in implementing previous recommendations. This reporting requirement may be satisfied by incorporating information from, or providing the Office with a copy of, reports prepared pursuant to the reporting requirements of the SCO as required under UTC's Consent Agreement with the United States Department of State, so long as the information required by this paragraph is included in any such report to the Office. The Office may consider the Independent Monitor's recommendations and the UTC Entities' actions in response in determining whether the UTC Entities have fully complied with their obligations under the Agreement.[6]

13. With respect to any recommendation of the Independent Monitor that any of the UTC Entities considers unduly burdensome, impracticable, unduly expensive or otherwise inadvisable, the UTC Entities need not adopt the recommendation immediately. Instead, the UTC Entities may propose in writing an alternative policy, procedure or system designed to achieve the same objective or purpose. As to any recommendation on which the UTC Entities and the Independent Monitor ultimately do not agree, the views of the UTC Entities and the Independent Monitor shall promptly be brought to the attention of the Office. The Office may consider the Independent Monitor's recommendation and the UTC Entities' reasons for not adopting the recommendation in determining whether the company has fully complied with its obligations under the Agreement.

14. At least annually, and more frequently if appropriate, representatives of the UTC Entities and the Office will meet together to discuss the monitorship and any suggestion, comments or improvements the company may wish to discuss with or propose to the Office, including with respect to the scope or costs of the monitorship.

15. The UTC Entities agree that, within 120 days of the Execution Date, the UTC Entities will submit to the Independent Monitor for approval a proposal ("Training Program Proposal") for a comprehensive export compliance training and education program ("Training Program"), which, in advance of its submission to the Independent Monitor, shall be reviewed and approved by UTC's Presidents' Council, UTC's Senior Vice President and General Counsel who serves as UTC's Senior Empowered Official under the ITAR, and UTC's Associate General Counsel with direct supervisory responsibility for CITC and oversight responsibility for export controls compliance across the UTC

---

[6] The Office and the Department of Justice will not be parties to any contract between the UTC Entities and the Independent Monitor. Accordingly, the Office and the Department of Justice will not arbitrate contractual disputes between the UTC Entities and the Independent Monitor. Rather, the Office's role in resolving disputes will generally be limited to questions of whether the UTC Entities have complied with the terms of the Agreement, rather than a dispute that has no corporate compliance or other law enforcement implications.

enterprise.  The Training Program Proposal shall be designed to advance and underscore a commitment to exemplary corporate citizenship, to best practices of effective corporate governance and the highest principles of integrity and professionalism, and to fostering a culture of openness, accountability and compliance across the entire UTC enterprise.  The Training Program Proposal submitted by the UTC Entities to the Independent Monitor shall include a description of the training proposed to be required of participants based on their role or function and the frequency of such training. The Training Program Proposal shall cover, at a minimum, the following subjects: (1) the obligations imposed by the federal export laws and regulations, including disclosure obligations; (2) proper internal controls and procedures; (3) discovering and recognizing export compliance issues; and (4) the obligations assumed by, and responses expected of, employees upon learning of improper or potentially illegal acts relating to export compliance.

16. To the extent it has not already commenced, the UTC Entities shall commence providing the training mandated above not later than 90 calendar days after approval of the Training Program Proposal by the Independent Monitor, and a written description of the content and implementation of the Training Program shall be included in the semi-annual reports described above.

17. The UTC Entities shall keep a record of the training provided and the names and positions of the individuals who received training for a period of at least five years.  Each employee who received training shall sign a document verifying that he/she has received the required annual training and understands the purpose of, their responsibilities under, and the consequences of violating the export compliance laws and regulations.

18. UTC's Chairman, President & CEO, the Senior Vice President and General Counsel who serves as UTC's Senior Empowered Official under the ITAR and UTC's Associate General Counsel with direct supervisory responsibility for CITC and oversight responsibility for export controls compliance across the UTC enterprise (collectively the "Certifying Officials"), shall each sign an annual compliance certification.  The annual compliance certification shall state as follows:

> "I (name) _____ , (title) _____ , do hereby certify that to the best of my knowledge and belief, as of December 31, _____ (year), UTC, its subsidiaries, and its majority-owned or controlled affiliates have reported to the appropriate official(s) of the United States government all known violations of the Arms Export Control Act, the International Traffic in Arms Regulations, the Export Administration Act, the Export Administration Regulations and/or the International Emergency Economic Powers Act identified as occurring after the execution date of the Deferred Prosecution Agreement."

The annual compliance certification shall be signed and dated.  The executed annual compliance certifications shall be forwarded to the Independent Monitor no later than the thirty-first of March for each year the Agreement is in effect.

19.   The UTC Entities accept and acknowledge responsibility for the conduct set forth in the Statement of Facts.

20.   The UTC Entities agree that in the event that future criminal proceedings are brought by the Office in accordance with paragraphs 27 through 31 of this Agreement, the UTC Entities will not contest the admissibility of the Statement of Facts in any such proceedings.  Nothing in this Agreement shall be construed as an acknowledgment by the UTC Entities that the Agreement, including the Statement of Facts, is admissible or may be used in any proceeding other than in a proceeding brought by this Office.

21.   The UTC Entities expressly agree that they shall not, through their present or future attorneys, Board of Directors, Presidents, CEOs, agents, officers or employees, make any public statement contradicting any statement of fact contained in the Statement of Facts. Any willful, knowing and material contradictory public statement by the UTC Entities, their present or future attorneys, Board of Directors, President, CEOs, agents, officers or employees, shall constitute a breach of this Agreement as governed by paragraphs 27 through 31 of this Agreement, and the UTC Entities would thereafter be subject to prosecution pursuant to the terms of this Agreement.  The decision whether any public statement by any such person contradicting a fact contained in the Statement of Facts will be imputed to the UTC Entities for the purpose of determining whether the UTC Entities have committed a willful, knowing and material breach of this Agreement shall be at the sole discretion of the Office. Upon the United States' notification to the UTC Entities of a public statement by any such person that in whole or in part contradicts a statement of fact contained in the Statement of Facts, the UTC Entities may avoid breach of this Agreement by publicly repudiating such statement within 72 hours after such notification.  This paragraph is not intended to apply to any statement by any former UTC Entities employee, officer or director, or any UTC Entities employee, officer or director testifying in any proceeding in an individual capacity and not on behalf of the UTC Entities.

22.   The UTC Entities have cooperated with the Office in connection with its investigation into the conduct set forth in the Statement of Facts.  The UTC Entities acknowledge and understand that their prior, ongoing and future cooperation are important factors in the decision of the Office to enter into this Agreement, and the UTC Entities agree to continue to cooperate fully with the Office, and with any other governmental agency designated by the Office, regarding any issues pertaining to, or possible violations of, the AECA, ITAR, EAA, EAR and IEEPA occurring after the Execution Date ("Potential Export Violations") about which the UTC Entities have knowledge or information.  With the understanding that nothing in this Agreement shall be interpreted to compel waiver of any applicable attorney-client privilege or work product protection, the UTC Entities agree that their continuing cooperation during the term of this Agreement shall include the following with respect to the Potential Export Violations:

(a)   Completely, truthfully and promptly disclosing all information within the UTC Entities' possession, custody or control with respect to the activities of the UTC Entities and their present and former officers, agents and employees, concerning Potential Export Violations. This obligation of truthful disclosure includes an obligation to provide the United States with such materials, upon

request, as promptly as is practicable, and an obligation to provide the United States reasonable access to the UTC Entities' documents, whether or not located in the United States, and reasonable access to the UTC Entities' facilities for that purpose. Cooperation under this paragraph shall include identification of documents that may be relevant to the matters under investigation.

(b) Retrieving, assembling, organizing and providing on request from the United States, documents, records, data or other tangible evidence in the UTC Entities' or any other UTC business unit's possession, custody or control in such format as the United States reasonably requests.

(c) Making available officers, directors and employees of the UTC Entities, and using their reasonable good faith efforts to make available former officers, directors and employees of the UTC Entities, whether or not any such current or former officers, directors and employees are located in the United States, to provide information and/or testimony at all reasonable times as requested by the United States, including sworn testimony before a federal grand jury or in federal trials, as well as interviews with federal authorities. Cooperation under this paragraph shall include identification of witnesses who, to the UTC Entities' knowledge, may have material information regarding the matters under investigation.

(d) Providing testimony, certifications and other information deemed necessary by the United States or a court to identify or establish the original location, authenticity or other evidentiary foundation necessary to admit in evidence documents in any criminal or other proceeding as requested by the United States.

(e) Consenting to any order sought by the United States permitting disclosure of any materials that constitute "matters occurring before the grand jury" within the meaning of Rule 6(e) of the Federal Rules of Criminal Procedure, provided that the UTC Entities first have an opportunity to designate any such materials as confidential or proprietary and thus exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552.

23. The UTC Entities agree that the United States may, in its sole discretion, subject to any applicable export controls restrictions, disclose to any government department or agency any information, testimony, document, record, data or other tangible evidence provided to the United States pursuant to this Agreement. If any information, documents, records, data or other materials provided after the Execution Date by the UTC Entities to the United States contain confidential or proprietary business or financial information, the UTC Entities may identify the relevant information or materials at the time of production. The United States agrees that it will maintain the confidentiality of, and will not disclose or disseminate, any confidential or proprietary business or financial information identified and provided by the UTC Entities without their consent, except that the United States may share such information with another government department or agency, or with the Independent Monitor / SCO, to the extent that the United States determines, in its sole discretion, that such disclosure is required by law or necessary to fulfill its duties and responsibilities.

24. Notwithstanding the United States' obligation to maintain the confidentiality of confidential or proprietary business or financial information under paragraph 23, and subject to applicable export control restrictions, the UTC Entities authorize the Office, the Federal Bureau of Investigation, the Department of Homeland Security, the Defense Criminal Investigative Service, the United States Department of Commerce, including the Office of Export Enforcement, and the United States Department of State, including DDTC, to share information from and about the UTC Entities with each other, and the UTC Entities hereby waive any confidentiality accorded to that information by law, agreement or otherwise that would, absent authorization by the UTC Entities, prohibit or limit such sharing. No other waivers of confidentiality shall be required in that regard.

25. The UTC Entities shall not engage, or attempt to engage, in "Criminal Conduct" (as hereinafter defined). If, during the Deferral Period, any of the Certifying Officials identified in paragraph 18 becomes aware of credible evidence of Criminal Conduct at any of the UTC Entities, said Certifying Official(s) shall inform the Office and the Independent Monitor / SCO on a timely basis of any such credible evidence of Criminal Conduct, including making available internal export compliance investigations and reports, voluntary disclosures, "whistleblower" complaints, and any other similar documents evidencing such Criminal Conduct. For purposes of this Agreement, "Criminal Conduct" is defined as: (1) criminal violations of the AECA, ITAR, EAA, EAR and IEEPA, as well as any associated fraud, occurring during the Deferral Period; and (2) any materially false, fictitious or fraudulent statements, or obstruction of justice, made in a matter within the jurisdiction of a department or agency of the United States with jurisdiction over the AECA, ITAR, EAA, EAR and IEEPA, including DDTC, occurring during the Deferral Period. This provision shall not apply to credible evidence of Criminal Conduct obtained by the UTC Entities after the expiration of the Deferral Period, as that term is defined in paragraph 1 of this Agreement.

26. The United States may continue to investigate current and former employees of the UTC Entities and any other UTC business unit. Nothing in this Agreement restricts in any way the ability of the Office from proceeding against any individuals, or to investigate and prosecute any employee or former employee of the UTC Entities or any other UTC business unit. It is the intent of the parties to this Agreement that the Agreement does not confer or provide any benefits, privileges or rights to any individual or other entity other than the parties hereto.

27. If the Office determines during the Deferral Period that any of the UTC Entities have committed any Criminal Conduct, or otherwise in any other respect willfully, knowingly and materially breached this Agreement, the UTC Entities shall, in the discretion of the Office, thereafter be subject to prosecution for any federal crimes of which the Office has knowledge, including crimes relating to the conduct set forth in the Statement of Facts. Except in the event of a willful, knowing and material breach of this Agreement, it is the intention of the parties to this Agreement that all investigations of the UTC Entities relating to the conduct set forth in, or relating to, the Statement of Facts that have been or could have been conducted by the Office or NSD prior to the date of this Agreement shall not be pursued further as to the UTC Entities.

28. If the Office determines that the UTC Entities have committed a willful, knowing and material breach of this Agreement, the Office shall provide the UTC Entities with written notice of this preliminary breach determination and, at the sole reasonable discretion of the Office, evidence supporting the preliminary breach determination. Within 30 calendar days from the date of the government's written notice, or any extension of that deadline agreed to by the Office, the UTC Entities shall have the right to make a presentation to the Office or its designees, including the United States Attorney for the District of Connecticut, to demonstrate that no breach has occurred, or to the extent applicable, that the breach was not a willful, knowing and material breach or that the breach has been cured. If the UTC Entities elect to make a presentation, the Office shall thereafter provide written notice to the UTC Entities of the Office's final determination regarding whether a breach occurred and whether the breach has been effectively cured. If the UTC Entities fail to make a presentation within 30 calendar days from the date of the government's written notice, or any extension of that deadline agreed to by the Office, the initial notification will become the final determination. Following receipt of an adverse final written determination by the Office, the UTC Entities shall have 10 calendar days to request further review by the Office of the Deputy Attorney General, and the applicability of paragraph 29 and the remedies set forth therein shall be suspended during the pendency of any such review. The parties further understand and agree that, subject to the provisions of paragraphs 29 and 30 of this Agreement and unless the Office elects Remedy 3 as set forth in paragraph 29, the determination whether the UTC Entities have breached this Agreement rests solely in the discretion of the Department of Justice, and the exercise of discretion by the Department of Justice under this paragraph is not subject to review in any outside court or tribunal.

29. If the Department of Justice makes a final determination that the UTC Entities have made a willful, knowing and material breach of this Agreement, the Office may elect from the following three remedies depending on the nature and seriousness of the breach:

1.    Remedy 1 – The Office may give the UTC Entities a specific time period in which to remedy the breach. If the Office determines that the UTC Entities have failed to remedy the breach during the specified time period, the Office may elect Remedy 2 or Remedy 3 below.

2.    Remedy 2 – The Office may assess an additional monetary penalty of not more than $10 million. The amount of the additional monetary penalty shall be determined by the Office based upon the nature and the seriousness of the breach. The UTC Entities may appeal the Office's determination that the UTC Entities breached this Agreement or the amount of the additional monetary penalty imposed to a retired federal judge, selected by the Office, sitting as an independent special master ("Special Master"). Review by the Special Master shall be *de novo*, and the United States shall bear the burden of proof to establish any factual issues by a preponderance of the evidence. The UTC Entities agree to pay for all costs associated with Remedy 2, including the costs of retaining the services of the Special Master. All findings of the Special Master shall be final and binding on the UTC Entities and the Office. The UTC Entities agree to pay any additional monetary penalty imposed within 30 calendar days of its assessment, or within 30 calendar

-17-

days of any Special Master decision on the matter if the UTC Entities choose to appeal the Office's determination that the UTC Entities breached this Agreement or the amount of the additional monetary penalty imposed. The UTC Entities' failure to make a timely payment will constitute a separate material breach of this Agreement. Payment of any additional monetary penalty shall not relieve the UTC Entities of performing all of their obligations under this Agreement.

3.    Remedy 3 – The Office may prosecute UTC and HSC on Count Two of the Information, and may prosecute PWC and HSC on Count Three of the Information, and any other criminal conduct discovered during the investigation. The UTC Entities shall be deemed to have stipulated to the admissibility into evidence of the Statement of Facts. The UTC Entities shall also be precluded from offering any evidence or arguments that the statements in the Statement of Facts are untrue. The UTC Entities also agree to waive any right to be indicted by a grand jury and stipulate that the United States may proceed by Information. In the event of a breach of this Agreement that results in a prosecution of any of the UTC Entities, such prosecution may be premised upon any information provided by or on behalf of the UTC Entities to the Office at any time, except that such prosecution may not be premised on information protected by the attorney-client privilege, attorney work product doctrine, Rules 408 or 410 of the Federal Rules of Evidence, or any other applicable privilege or protection.

30.   The UTC Entities agree to waive any right they may have in Remedies 1 or 2 to a determination by a Court with respect to whether it breached this Agreement or any monetary penalty imposed for a breach of this Agreement.

31.   In case of a willful, knowing and material breach of this Agreement, any prosecution of the UTC Entities relating to the conduct set forth in the Statement of Facts that is not time-barred by the applicable statute of limitations as of the Execution Date (and including the effect of any tolling agreements), may be commenced against the UTC Entities notwithstanding the expiration of any applicable statute of limitations during the Deferral Period. The UTC Entities agree that this waiver is knowing and voluntary and in express reliance on the advice of counsel.

32.   In the event that the Office is conducting an ongoing investigation, prosecution or proceeding relating to the conduct set forth in the Statement of Facts, the provisions of paragraph 22 regarding the Company's cooperation shall remain in effect until such investigation, prosecution or proceeding is concluded. In all other respects, this Agreement expires two years after the filing date of the Information described in paragraph 2 of this Agreement (the "Expiration Date").

33.   The Office agrees that if, in its sole reasonable discretion, the Office concludes that the UTC Entities are in full compliance with all of their obligations under this Agreement, the Office, within 30 calendar days of the Expiration Date, will seek dismissal with prejudice of Count Two of the Information as against UTC and HSC, and Count Three of the Information as against PWC and HSC. Except as otherwise provided herein, during the Deferral Period and upon the Expiration Date, the Office and NSD agree that they will not undertake any further prosecution of the UTC Entities relating to the conduct set forth in the Statement of Facts.

34.   The UTC Entities agree that, if they sell or merge all or substantially all of their business operations as they exist as of the date of this Agreement to or into a single purchaser or group of affiliated purchasers during the term of this Agreement, they shall include in any contract for sale or merger a provision binding the purchaser/successor to the obligations described in this Agreement. It is understood that this paragraph does not apply with respect to acquisitions by any of the UTC Entities.

35.   It is understood that this Agreement is binding on the UTC Entities, NSD and the Office, and does not bind other federal, state or local authorities.

36.   This Agreement and its appendix, as well as the Plea Agreement with PWC, constitutes the full and complete agreement between the UTC Entities, the Office and NSD, and supersedes any previous agreement between them. The parties acknowledge that this Agreement was reached as part of a global resolution among the UTC Entities, the United States Department of Justice and the United States Department of State. No additional promises, agreements or conditions have been entered into other than those set forth in this Agreement, its appendix, and the Plea Agreement with PWC, and none will be entered into unless in writing and signed by the Office, NSD, counsel for the UTC Entities and duly authorized representatives of the UTC Entities. It is understood that the Office may permit exceptions to or excuse particular requirements set forth in this Agreement at the written request of the UTC Entities or the Independent Monitor / SCO, but any such permission shall be in writing.

AGREED TO:

_Chester Paul Beach Jr._

CHESTER PAUL BEACH, JR.
ASSOCIATE GENERAL COUNSEL
UNITED TECHNOLOGIES CORPORATION
on behalf of United Technologies Corporation,
Hamilton Sundstrand Corporation and
Pratt & Whitney Canada Corp.

Dated: 6-28-12

_James T. Cowdery_

JAMES T. COWDERY, ESQ.
COWDERY, ECKER & MURPHY L.L.C.
Attorney for UTC, HSC and PWC

Dated: 6·28·12

_Lisa Monaco_

LISA O. MONACO
Assistant Attorney General
National Security Division
United States Department of Justice

Dated: 6/27/12

_David B. Fein_

DAVID B. FEIN
United States Attorney
District of Connecticut

Dated: 6/28/12

_Michael J. Gustafson_

MICHAEL J. GUSTAFSON
Assistant United States Attorney
District of Connecticut

Dated: 6/28/2012

_Stephen B. Reynolds_

STEPHEN B. REYNOLDS
Assistant United States Attorney
District of Connecticut

Dated: 6/28/2012

-20-

## Appendix A – Statement of Facts

United Technologies Corporation ("UTC") is a Delaware corporation with offices and headquarters located in Connecticut.  UTC is a publicly traded corporation, the common stock of which is listed on the New York Stock Exchange.  UTC's operating subsidiaries and divisions research, develop, manufacture and service high-technology products in numerous areas, including aircraft engines, aircraft and spacecraft systems, space propulsion, helicopters, HVAC, fuel cells, elevators and escalators, fire and security, building systems, and industrial products.  Through its aerospace business units, UTC is a large U.S. defense contractor.

Pratt & Whitney Canada Corp. ("PWC" or "P&WC"), a wholly owned subsidiary of UTC, is a Canadian corporation with headquarters in Longueuil, Quebec.  PWC is an aircraft engine manufacturer that has produced more than 73,000 engines, of which there are currently more than 48,000 engines in service on over 25,000 aircraft operated by some 10,000 operators in 198 countries.

Hamilton Sundstrand Corporation ("HSC"), a wholly owned subsidiary of UTC, is a Delaware corporation with offices and headquarters located in Connecticut.  HSC designs and manufactures technologically advanced aerospace and industrial products, and produces aircraft systems for both commercial and military aircraft.  Examples of HSC's aerospace products include electric power generating, distribution, management and control systems; engine control systems; primary and secondary flight controls and actuation systems; propeller systems; and electronic controls and components.

## I.  THE VIOLATIONS

This case involves the unlicensed and unlawful export to China of multiple versions of HSC software to test and operate an Electronic Engine Control ("EEC") system for certain PWC helicopter engines, which were ultimately used in Chinese Z10 military attack helicopter prototypes.

The conduct involved three violations of law.  The first were export violations by PWC in connection with exports of a defense article, specifically, the software to test and operate the EEC system for 10 PWC helicopter engines that were used in a Chinese Medium Helicopter ("CMH") development program.  The exports were made in violation of the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778(b)(2) and (c); the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. §§ 127.1 and 127.3; and the causing provisions of 18 U.S.C. §2(b).  Three Z10 prototypes were built using PWC engines that contained HSC EEC software that had been specifically modified in the United States for use in the military helicopter application.  Even though the engines themselves and the accompanying EEC *hardware* were dual-use items that could be lawfully exported to China, the EEC *software* was modified for the Z10 aircraft application and thereby became subject to the ITAR.  As a result, the exports required a license from the Department of State, which was never sought and, if sought, would have been denied.

The second violation was the making of false statements by UTC, PWC and HSC in two disclosure letters to the Department of State, in violation of 18 U.S.C. § 1001(a)(2).  In the letters, UTC, PWC and HSC falsely stated that PWC understood from the inception of the program that civil and military variants of the CMH would be developed concurrently and in parallel from a common "platform" engine, transmission and rotor, when in fact employees in PWC's marketing and export departments were aware from the start of the program that the Chinese were first developing a military version of CMH, with the civil version to follow at some future time.  By the time the disclosures were submitted to the State Department, employees of HSC and a UTC division who were working on the disclosures had become aware that the statements concerning PWC's understanding at the inception of the program were not accurate.

The third violation was the failure of PWC and HSC to timely report to the United States Department of State's Directorate of Defense Trade Controls ("DDTC"), as required by the ITAR, that a defense article (the modified HSC EEC software) had been transferred to China, a country with which the United States maintains an arms embargo, in violation of 22 U.S.C. § 2778(c) and 22 C.F.R. § 126.1(a) and (e).

## II.   THE EXPORT VIOLATIONS

### PWC's Early Knowledge of the Military Version of the Helicopter

In the mid-to late 1990s, the China Aviation Industry Corporation ("AVIC II") entered into a joint venture with Eurocopter SA, a subsidiary of the European Aeronautic Defense and Space Co. and Agusta S.p.A. to develop a new helicopter called the "Chinese Medium Helicopter" or "CMH," a twin engine, 5.5-ton helicopter.  In early 2000, Agusta inquired of PWC about using its PT6C-67C turboshaft engines (the "67C") to power the CMH helicopter, as Agusta was already using the 67C to power its AB139, a 6-ton civil helicopter.  PWC personnel understood that while the CMH would eventually have both military and civil applications, the initial application would be military.  PWC marketing personnel visiting AVIC II in China inferred from the nature and extent of the resources devoted to the program in China that the CMH was a military-first program.

PWC marketing and export personnel knew, from the inception of the project, that the Chinese intended to develop a military version of the CMH.  PWC also recognized at the outset that their participation in such a program would implicate U.S. export policy and could raise U.S. export-control issues.  For example, in an email dated August 29, 2000 a PWC marketing manager wrote to PWC export personnel:  "Discussions on [the PWC engine] for [the] Chinese Z-10 *attack helicopter* are progressing smoothly.  From the attendance at the meetings, it is clear that this is a serious effort and they have a tight timetable." (emphasis added).  The email continued: "I believe it is important that P&WC management take a clear position on this project.  Aside from legal considerations on export control issues, how will P&WC/UTC respond if [the] US government put[s] some pressure on UTC?"  The author of the email expressed concern that

"P&WC will lose all credibility in China, if P&WC/UTC, as [a] corporation, backs out of the program at a later date when put under pressure even if [a] legal basis for export restriction may not exist." Accordingly, he concluded, "A clear position must be taken and support for this position should be secured within UTC.  Please advise."[1]

AVIC II stated that it had been developing an indigenous engine, the WZ-9, to serve as the power plant for the CMH, but that the WZ-9 had encountered delays.  AVIC II explained that it had decided to seek a Western supplier to enable the Chinese to move forward with the development program, with the long-term goals of having the WZ-9 power the military version and having the Western engine power the civil version.  PWC explained to the Chinese that its long-term goal was to have its 67C engines power the civil version of the CMH because there was a large, untapped market in China for civil helicopters.  The Chinese made it clear that if PWC wanted to have its engines considered for the yet-to-be-developed civil version, it would have to provide its engines immediately for the development program, with the understanding that the initial application of the CMH would be military.

Initially, PWC took the position that because the PWC engine at issue was already in use in civil applications worldwide, PWC would not need a license from Canadian authorities to export the same engines to China for use in the development of the CMH.  Specifically, in early 2000, Agusta had asked PWC what export-control restrictions would apply to exporting the 67C for the CMH program.  PWC responded that, because the 67C was civilly certified, a Canadian export license would not be required to export it to China for use on a military aircraft, as long as the engine was not modified for the military application.  PWC also conveyed to Agusta its understanding that changes to the EEC software to satisfy operational requirements did not constitute "modifications" of the engine for purposes of Canadian export laws.

However, on September 19, 2000, the Canadian Government's Export Controls Division in the Department of Foreign Affairs and International Trade ("DFAIT") told PWC that because of the technology level of the 67C engine and the non-civil-certified initial application, PWC *would* need to apply to DFAIT for an export permit.  Internal PWC documents also indicated that during briefings by PWC in Ottawa, Canadian officials were "particularly interested to know whether the aircraft was a gun ship."

On September 26, 2000 PWC submitted a letter and application to DFAIT for a permit to export 10 67C engines for the CMH development program.  The letter and application did not refer to an "attack helicopter."  The letter stated that the "initial version of the helicopter will be for military use.  Civil versions are also planned but no time frame has been provided for this aspect of the program."  The letter also explained that while it was expected that the military

---

[1]  The email was from PWC's General Manager in charge of Marketing and International Business Development in Asia (the "PWC GM for Asia Marketing") to the Vice President of PWC's Marketing and International Business Development Department (the "PWC International Marketing VP") and PWC's Manager for Government Relations and Export Controls (the "PWC Export Manager").

version would eventually be powered by the WZ-9 and the civil version by the 67C, PWC would have to participate in the then-ongoing development program in order to be eligible to secure a position as the engine supplier for the civil version.  The letter also described a potentially lucrative market for Chinese helicopters for the Canadian-based PWC: "The Chinese civil helicopter market is starting to develop.  There is a very limited fleet (69 including 14 training aircraft) of civil helicopters currently in service.  As air traffic control restrictions are relaxed and economic development continues, there will be strong growth in the fleet size within China . . . [T]he Western power plant supplier must enter the development program for the helicopter program now to secure position as power plant supplier for the future civil version.  A market for several hundred western powered 5.5 ton helicopters is expected over 15 years (after start of production) . . . Total revenues for Chinese PT6C-67C sales and service could exceed $500 million USD over this period."

### The "Sudden Appearance" of the Civil Program

After PWC met with DFAIT and was told that an export permit was required, PWC wrote to AVIC II on September 25, 2000 informing them "that the position of the Canadian government differs from P&WC's interpretation . . . Because of the technology level of the . . . engine and the non-civil certified initial application, the Canadian government requires that P&WC apply for a license for the export of [the] engines for the 5.5 ton helicopter program." PWC stated: "If the initial version of the 5.5 ton helicopter was civil certified, [an] export license for [the] engines would not be required for the initial civil version or the subsequent military versions provided the engine configuration remained unchanged."  PWC therefore suggested "that we continue with the technical evaluation of the [engine] for the 5.5 ton helicopter and work together to ensure Canadian government approval of export of PT6C-67C engines to China."

On September 29, 2000, the Director General of AVIC II replied, expressing  "hope that P&WC will continue the efforts in applying for [the] export control license." AVIC II also offered:  "If P&WC needs, the Chinese party will provide related information of the civil version of the 5.5t helicopter."

A little more than a month later, in early November 2000, representatives from the China National Aero-Technology Import & Export Corporation ("CATIC") gave PWC a briefing paper that described the civil variant of the CMH – the "Z10C" – as a 6-ton helicopter to be used for, among other things, the transport of passengers and goods for short distances, tourist transportation and sightseeing, servicing off-shore oil platforms, business VIPs, search and rescue, and forest fire prevention.  The briefing paper included a schedule that was essentially contemporaneous with the one for the military variant.  The Chinese claimed that the civil and military programs were being developed very much in parallel.

In a November 9, 2000 email from the PWC GM for Asia Marketing to the PWC Export Manager, bearing the subject "China Helicopter Program," the PWC GM for Asia Marketing stated: "[The PWC International Marketing VP] and I met with AVIC II.  They did not offer any more details about the military application and we did not probe further."  The author suggested: "I think we should follow the strategy previously discussed:  – China is developing new helicopter program[;] – Civil and military applications[;] – military helicopter will have multiple purpose[s] and roles."

PWC marketing personnel who were knowledgeable about the program nevertheless expressed skepticism internally about the timing of this newly described civil program.  Only a few months earlier, the Chinese had said that a start date had not yet been set for the civil program.  Nonetheless, shortly after receiving the briefing paper, PWC marketing personnel turned a blind eye to their doubts and decided to accept the revised description of the program. In so doing, PWC marketing and export personnel consciously avoided asking any questions about why a civil application that until recently had no time frame was now to be developed in parallel with the ongoing military application.

For example, an email dated November 13, 2000 from the PWC GM for Asia Marketing to the PWC Export Manager and the PWC International Marketing VP indicated that while the Chinese had now outlined the "basic elements" of a civil helicopter program, the "sudden appearance" of the civil program "indicate[d] that it may have been put together to aid approval of [the] export license[.]"  The email nevertheless suggested that "[b]y putting forward the civil helicopter program now" – whether *real or imagined*" – "an opening is created for P&WC to insist on exclusivity in [the] civil version of this helicopter." (emphasis added).  The email went on to indicate that the Chinese would "no longer make reference to the military [aircraft] program," and suggested that "[i]t may be worthwhile to indicate" to the Canadian licensing authorities "that a civil program is being organized and is no longer TBD . . . . There will be a civil version developed.  However it will most likely be certified after the military version."

The next day, PWC's Export Manager sent a letter to DFAIT that largely repeated the substance of the November 13, 2000 email but removed the "sudden appearance" and "real or imagined" language.  PWC's Export Manager wrote that AVIC II had provided PWC with the basic elements of a civil helicopter program and that the development programs for the civil and military helicopters were very much in parallel, supporting the company's previous statement to DFAIT that the Chinese were developing a helicopter platform that could have both civil and military use.  He added that the Chinese did not appear concerned that DFAIT might at some point in the future refuse to license the export of 67C engines for the military version, which supported PWC's understanding that the Chinese intended to use the indigenous WZ-9 to power the military version.  Shortly after this letter was sent, DFAIT issued a permit for PWC to export 10 67C engines for the CMH development program.

### The Contracts for the Development Engine and Development Software

On January 20, 2001, AVIC II and CATIC entered into a contract with PWC to purchase 10 PT6C-67C engines. A PWC Internal Order noted: "The engine will require . . . unique software for this installation." Pursuant to this contract, and in accordance with the permit from DFAIT, PWC shipped 10 67C engines, without EEC software, to China between November 2001 and October 2002 for the CMH development program. These engines, which included HSC EEC *hardware*, were identical to the engines on the civil AB139 and were dual-use items under the ITAR.

In January 2002, PWC issued a purchase order to HSC to develop EEC *software* for the CMH development program. HSC was already supplying the EEC hardware and software for the 67C engines for the AB139. PWC representatives told HSC representatives that the CMH was a commercial or dual-use Chinese helicopter. No mention was made of a military end use. Accordingly, HSC internally classified the EEC software as an item controlled by the United States Department of Commerce to be exported to PWC on an "NLR" (no license required) basis.

### HSC's Software Modifications and Exports Thereof

HSC's software engineers worked from the baseline EEC software used on the AB139, making changes as directed by PWC. No HSC employees ever went to China or spoke to the ultimate customer; HSC dealt solely with PWC. The EEC software modifications were made in order to allow the engine to interface with the components of the new aircraft application. None of the EEC software modifications suggested a military use, or militarized the capabilities of the engine, or otherwise triggered any suspicions on the part of HSC software engineers that the modifications were for a military application.

HSC made the software modifications in a series of "versions," each of which had a unique part and serial number. After each version was completed, HSC would send it electronically to PWC. In some cases, PWC would use the software internally as part of the engine development program, while in other cases PWC exported the software to China via email to be loaded into the 67C development engines already in China. The attached Schedule A shows all of HSC's exports of modified EEC software to PWC and the date of PWC's exports of the modified EEC software to China. Between January 2002 and October 2003, HSC exported 12 versions of the modified EEC software to PWC, six of which PWC exported to China for use in the CMH development engines. Because HSC had classified the EEC software as Commerce-controlled and NLR, it did not seek or obtain an export license from the Department of State.

### PWC's Knowledge of the Export-Control Issues

As the project proceeded, PWC employees continued to acknowledge concerns about export compliance. Internal documents showed that PWC knew about U.S. laws and regulations prohibiting the export of military aircraft components obtained from the United States to China. For example, on May 8, 2002, the PWC Export Manager forwarded a UTC Corporate email entitled "Federal Register Notice – CATIC" to the PWC GM for Asia Marketing and the PWC International Marketing VP, stating: "FYI and to reinforce the issue that the US will not approve any export of military goods to China which includes components considered to be military by the US that are sourced in the US and re-exported from Canada." Similarly, an email string in late June and early July 2002 included an email from an export lawyer at UTC Corporate Headquarters ("HQ") in Washington, D.C. to various other UTC Corporate D.C. recipients, bearing the subject line "CATIC and UTC in China." The email discussed what types of dealings UTC business units could have with CATIC and stated that all United States Munitions List exports of any kind to Chinese entities, including CATIC, were prohibited. The email stated: "State will deny any such license applications. . . . We have been counseling the business units regularly on this matter. In short, for any sales or transfers (State or Commerce) to CATIC, a license requirement is a deal killer." The PWC International Marketing VP, the PWC GM for Asia Marketing and the PWC Export Manager received copies of the email.

Internal documents showed that PWC also knew that the CMH program might run afoul of the U.S. arms embargo with China. For example, in a September 12, 2001 email from the PWC Export Manager to the PWC International Marketing VP and the PWC GM for Asia Marketing, the PWC Export Manager forwarded a UTC-wide notice regarding the imposition of U.S. sanctions related to Chinese military aircraft and stated:

> Please note the attached notice (in bold) regarding the imposition of US sanctions on the Chinese Government for military aircraft. *We must be very careful that the helicopter programs we are doing with the Chinese are not presented or viewed as military programs. As a result of these sanctions, we need to be very careful with the Z10C program. If the first flight will be with a gun ship then we could have problems with the US government.* In addition, we could run into problems with the Canadian Government as we have told them that the program is civil and the military versions (gun ship) would have the Chinese WZ-9 engine. This was the basis for the Canadian permit that was issued for the export of up to 10 PT6C-67C engines and which is valid till 30 November 2002.

(emphasis added).

Internal documents also showed that PWC export personnel knew that the EEC software being provided by HSC for the Z10 program was U.S.-based, controlled technology the export of which required a license. For example, in an April 2002 email string bearing the subject line "EEC S/W Downloads for CMH (Z10) Program," the PWC GM for Asia Marketing asked

whether there would be any export-control issues involved if PWC was to train and have Chinese nationals, in China, make changes to the EEC software during the Z10 helicopter development. PWC's Export Manager responded, in pertinent part, that "the software is controlled technology and is also US technology I think. If it is US then we will require a US license."

### Importance of the Chinese Market to PWC

PWC believed that the CMH program provided a substantial financial opportunity for the company because the civil helicopter market in China, which was just beginning to develop, was expected to become very large after air space restrictions were lifted. PWC informally estimated that the Chinese civil market could eventually be worth over a half a billion dollars, and possibly two billion dollars, in sales to the company in the coming years. PWC wanted to secure its position for that market and, if possible, beat out its European competitors, who were also trying to capture the Chinese business. PWC understood that participating in the CMH development program was a condition to being eligible to supply engines in the future for the civil market.

Internal PWC briefings reflected this. For example, a September 6, 2002 PWC document entitled "China Aviation Industry Corporation II (AVIC II)" stated: "Market for CMH is large . . . . with the selection of P&WC engines for the . . . Chinese Medium Helicopter, P&WC has finally broken the monopoly of [a competitor] . . . . China's civil helicopter market potential is large (estimated at close to 20,000 aircraft by some)."

Similarly, in a May 2004 briefing for a senior executive of UTC regarding projects in China, including the Z10, PWC noted that the program was a "major breakthrough for P&WC" as it had broken the dominance of a major competitor in "the Chinese helicopter engine market." PWC expressly stated that it "took a *calculated risk* in competing and winning the CMH . . . program," (emphasis added) and noted that "China has less than 100 civil helicopter[s] in service. There is also a very limited number of modern helicopters in military service. Rapid growth of the Chinese market is expected." PWC therefore recommended that it continue to "actively support . . . the CMH . . . program[] *to maintain and strengthen position in the market*." (emphasis added).

In February 2006 – after HSC was no longer involved in the program – PWC sought approval from the Canadian government to export 120 engines to China, 110 of which were to be used as production engines for the military version of the helicopter, and 10 of which were to be used as developmental engines in support of the development of the civil version. In a cover letter PWC stated: "The Chinese aircraft market is distinguished by its enormous potential . . . . We have been working towards this opportunity for some time. We have cultivated close business ties with China with the belief that our investment would one day bring us favorable returns. The moment is at hand. Our engine has been selected, and we have been awarded significant production orders."

-8-

In a section of the submission titled "Importance of the CMH Program to P&WC," PWC stated to the Canadian government that "[m]arket demand for P&WC's PT6C-67C engines on the CMH program . . . is 2000 engines.  Over the life of the program this results in potential sales of **over $2.0 billion USD to P&WC** (including spares and aftermarket services)." (emphasis in original).  PWC explained that "[b]y participating in the initial aircraft development phase, P&WC has secured a position as the exclusive western engine supplier for this program."  PWC then stated, in bold:

> **The success of the CMH program is therefore most important to P&WC's future in China.  P&WC's performance on the CMH program will directly impact whether we can maintain the relationships, credibility and momentum built-up over many years as a reliable engine supplier to the Chinese aircraft industry.  We are on the brink of reaping the benefits of our investment.  Obviously, this is critical to our business . . . success here will pave the way for additional opportunities for P&WC's products on future aircraft programs....**
>
> **If P&WC cannot deliver PT6C-67C engines for the military variant helicopter, the consequences will be severe; including the loss of its position as the engine supplier for the civil variant platform . . . More importantly, P&WC will be seen as an unreliable supplier, not only with respect to the CMH program, but potentially affecting our position on all current and future aircraft programs in China[.]**

(emphasis in original).[2]

## PWC Engineers Witness the Z10 Attack Helicopter in China

In March 2003, PWC engineers were on site in Jingdezhen, China, to assist with ground testing, which was their first opportunity to see the CMH.  An internal PWC email dated March 13, 2003 bearing the subject "Z10 1st Flight," for example, indicated:  "A meeting was held today to review the Z10 test plan and review testing requirement prior to first flight . . . . We will be able to see the helicopter first time on Saturday, 15th March."

On March 15, 2003, two PWC engineers saw the first CMH prototype (the PT02).  The prototype, on which twin PWC 67C engines were mounted, had a stepped cockpit, two-seat, tandem configuration – typical of an attack helicopter.

---

[2]  As set forth in greater detail below, CATIC subsequently announced a separate "Z15" as the civil version of the helicopter, and solicited proposals from other engine suppliers for that civil version.  PWC thereafter informed the Canadian government that "[d]ue to the decision of the customer to change its requirements and re-open sourcing, we are no longer interested in participating in the Z10 portion of the program and will require a different permit for the . . . Z15 (with a different engine)."  Ultimately, PWC did not deliver production engines for the CMH program.

During the course of the investigation, law enforcement officers interviewed the engineers who first saw the Z10's two-seat attack configuration. At the time they first saw the prototype, the two engineers were unaware that the Chinese were developing a military attack helicopter or that certain individuals within PWC knew so. Rather, the engineers believed that the CMH program involved a 12-seat transport helicopter that was either civil or dual-use in nature. The engineers were surprised to see a Z10 helicopter prototype with a military, two-seat tandem configuration, bearing PWC engines and mock-up weapons. After the PWC engineers were invited by the Chinese to walk around the helicopter, one of the PWC engineers asked the Chinese program chief "where are the other ten seats?" According to the engineer, the program chief laughed off his comment. According to another engineer, when they asked the Chinese about the military design of the Z10, the Chinese personnel politely smiled, showed no concern, and explained that their program had been budgeted for an attack helicopter.

When the PWC engineers returned to Montreal, they met with the PWC GM for Asia Marketing, the PWC Export Manager and other PWC employees to discuss the development. According to one engineer, during the meeting, the PWC Export Manager maintained that if the engine had a predominantly civil application, PWC could still use it on a military application, so long as PWC did not modify the engine and kept it exactly like an already civil-certified version. The engineer recalled that while participants at the meeting discussed the need to advise the Canadian government of the two-seat military version, there was no mention of notifying UTC or HSC. The engineer stated that after he returned to Canada, no one told him to stop working on the Z10 project and he continued to work on the program for two or three years.

According to another engineer, during the meeting that took place at PWC after the engineers returned from China, the PWC GM for Asia Marketing and the PWC Export Manager expressed surprise about the design. The engineer, however, stated that no restrictions to the project were imposed at that time and he continued to work on the project, including making several more trips to China for the Z10 and other projects.

As a result of the meeting, the PWC Export Manager decided to notify DFAIT that the first CMH prototype was the military version.

**PWC's April 22, 2003 Letter to DFAIT**

On April 22, 2003, the PWC Export Manager wrote a letter to DFAIT that stated: "[i]n the initial permit application we had informed you . . . that there would be two aircraft development programs for both civil and military helicopters and that the development of these helicopters would be done very much in parallel." The letter stated that delays in the development of an indigenous Chinese engine had "prompted the Chinese to consider using the [PWC] engine for the initial military aircraft." In addition, the letter noted that "the prototype development program ha[d] progressed faster than expected and the ground runs of the first prototype aircraft ha[d] commenced with the [PWC] engine[,]" and that the "[f]irst flight of the aircraft [wa]s expected to be before the end of April and w[ould] be the two seat military version

of the aircraft and not the civil version." The letter expressed concern "that the first aircraft to fly will be the military version," but stated that PWC had been "assured by the Chinese that the civil aircraft is continuing under development and that the [PWC] engine w[ould] only be used on the military version for a limited transition production batch." PWC asked DFAIT, "because of the sensitivity of military programs in China," to contact the company if the agency believed that, in light of these developments, a permit would be needed to export 67C engines to China for the CMH program.

On May 8, 2003, the PWC Export Manager emailed a copy of his April 22, 2003 letter to a UTC official in Government Business Development in UTC's Washington, D.C. Office.

PWC did not send the April 22 letter to HSC. Nor did anyone from PWC tell HSC that the first prototype was an attack helicopter; PWC did not communicate that information to HSC until early 2004. As a result, through the summer and early fall of 2003, HSC continued to work on the modified EEC software and send completed versions to PWC. HSC exported the final version of the EEC software to PWC on August 29, 2003, and a slightly revised version on October 10, 2003 – after PWC knew that the Chinese were developing an attack helicopter and that the first CMH prototype was an attack helicopter. Shortly after receiving these final software versions from HSC, PWC exported them to China, where they were loaded into the Z10 development engines.

PWC internal documents written after the April 22 letter further confirmed that PWC marketing and export personnel understood that the initial version was the military variant, which had an attack helicopter configuration. For example, a PWC International Business Development Review, dated May 2003, included a program status update that provided: "First Official Flight – April 29th . . . . *Attack helicopter configuration . . . 1st application will be attack.*" (emphasis added). Moreover, a September 25, 2003 PWC presentation acknowledged that the military version of the helicopter would be the first to fly and that using U.S.-sourced and ITAR-controlled EEC software would be unlawful. Bullet points in the briefing included: "export control potential issue"; "first production is for military use"; "*US: Unique US sourced parts subject to ITAR re-export license*" [sic]; and "*EEC Sourcing . . . No license can be obtained for US sourced parts to China from US*" (emphasis added).

### HSC Learns of the Export Issue and Issues a Stop-Work Order

By January 2004, HSC was aware that there might be an export problem with putting its EEC software on the Z10, and it was clear that both HSC and PWC knew there was an issue. HSC Software Control Board Meeting Minutes from January 2004, for example, contained indications that "PWC is having problems with export control."

Around the same time, PWC explored obtaining the EEC software from an alternate, Canadian-based supplier. On January 23, 2004 PWC issued an internal order to re-source the EEC for the Z10 to a Canadian supplier, noting: "Due to [e]xport control reason[s], the current EEC made by HSC is no longer acceptable for the Z10/PT6C-67C engine. The EEC will be replaced with one made by [a Canadian supplier]."

In late January 2004, HSC requested an end-use statement from PWC for the Z10 program. In a January 28, 2004 email to the PWC GM for Asia Marketing, copying the PWC International Marketing VP and other PWC employees, PWC's Export Manager stated: "We are now being asked by Hamilton Sundstrand to provide the end use for the Z10 program. They require this to determine if there are any US re-export issues. Would you please provide me with a statement of the end use for the Z10 program that I can provide to HS . . . . I expect that this will not be the last request of this nature as the US suppliers are becoming more aware of export and re-export issues."

On February 3, 2004, PWC's Export Manager responded, in pertinent part: "The . . . engine is installed in the Chinese Medium Helicopter development platform which will support both [a] civil and military version of the helicopter . . . Based on current activity, the military version of the helicopter appears to lead the development program. The civil program is active but certification date has not been announced . . . . As the military version of the helicopter appears to be the first application, any US sourced component[s] that are not common to other civil certified engine applications will be subject to the US ITAR controls and will require an export license from State in order for HS[C] to ship the components to P&WC and for P&WC to ship these components either as spare parts or as part of the engine for this application to China. It is our understanding that the US will not issue an export license for any military component to China. We are therefore required to resource this component from HS[C] to a non US supplier as we cannot risk the supply of components should the first application be military and we are refused a US export license for China."

HSC's export group confirmed PWC's assessment, and HSC stopped work on the CMH program in mid-February. A February 6, 2004 email exchange between HSC employees, forwarding PWC's response, stated: "It appears, per below, that the lead on this application in China will be a military application. Do you concur with PWC's assessment of the situation regarding the state department and Chinese military?" An HSC employee with export control responsibilities responded: "I believe that [the PWC Export Manager's] assessment is absolutely correct. There may be a problem here." As a result, on February 13, 2004, HSC stopped work on the program.

HSC's Business Manager in Engine and Control Systems, who was directly involved in the Z10 project as the primary liaison between HSC and PWC, stated that prior to 2004, there was no indication from PWC that the end product was a military application. According to the Business Manager, based on all of his conversations with PWC, he believed that the program was a Chinese commercial program, and the program did not strike him as problematic in any way. Based on his conversations and interactions with PWC, it was his understanding that the Z10 was basically a clone of a commercial aircraft already in service. The Business Manager stated that he first heard about the military application for the Z10 in the last week of January of 2004 when a colleague mentioned it. The Business Manager then called his counterpart at PWC, who told him that the first version of the helicopter was, in fact, military. According to the Business Manager, HSC shut down the program within a week.

-12-

### PWC Continues to Modify and Export the HSC EEC Software

On February 20, 2004, PWC told the Chinese that due to export-control regulations, the EEC needed to be obtained from a new supplier. In the meantime, PWC told the Chinese that PWC could continue to support the HSC EEC software in the form of minor changes or "patches," but because of export restrictions PWC would not be able to make any software logic changes. PWC's Export Manager told the engineers that PWC could make the patches to the HSC EEC software as long as they used Canadian in-house capability and there was no input from HSC.

Without assistance from HSC, PWC thereafter modified versions of the previously supplied HSC EEC software on its own and continued to export those modified versions to China for more than one year, through and including June 21, 2005 as set forth on the attached Schedule A. Specifically, PWC software engineers made four patches to the HSC EEC software. The patches were then exported to China on or about November 17, 2004, January 4, 2005, April 2, 2005 and June 18, 2005. The exports were accomplished by emailing the revised software to PWC's representative in China, who downloaded the patched software into the 67C development engines.

Interviews of both current and former HSC employees confirmed PWC's actions following HSC's stop-work order. Specifically, HSC's Business Manager in Engine and Control Systems confirmed that PWC contacted a Canadian supplier to perform the EEC work due to export issues. He indicated, however, that for the Canadian supplier to provide EEC's or EEC software to PWC, they would have had to start from scratch on their own design and processor.

### Reports to UTC on the Z10 Program in 2004 and 2005

PWC personnel provided briefing papers for UTC senior management to prepare them for annual business trips to China. A briefing paper dated May 18, 2004, prepared by PWC's GM for Asia Marketing, expressly stated: "[The CMH Z10] Platform will support both military and civil versions of the helicopter . . . Two seat military version has flown first," with "[t]wo prototypes . . . in flight test." The briefing further indicated that although an indigenous Chinese WZ-9 engine was supposed to be developed for the military application, "engine development [was] behind schedule and AVIC II [was] considering ordering up to 100 [PWC] engines to support initial production batch in 2005."

The May 2004 briefing for UTC senior management also noted that the Z10 program "was a major breakthrough for P&WC as it breaks the dominance of [a competitor] on the Chinese helicopter engine market" and further commented: "PWC took a *calculated risk* in competing and winning the CMH . . . program. *Because of military applications, risks do exist on export control issues.* These risks have been mitigated by obtaining the necessary export permits and through appropriate selection of suppliers for engine components." (emphasis added). PWC's intention, therefore, was "to actively support . . . the CMH . . . to maintain and strengthen position in the market."

-13-

A UTC official in Government Business Development  – (the same individual who had received a copy of PWC's April 22, 2003 letter to DFAIT) – reviewed this May 2004 briefing paper and then emailed it to two executive-level lawyers in Pratt & Whitney's ("P&W") legal department with substantial experience in and responsibility for export control matters, with the following comment:

> Attached is a briefing paper for [UTC senior management's] upcoming trip to China (June 22-26).  Please note the description of the PT6 activity with the helicopters, especially the Z-10c.  *I would say that the "2 seat version" is code for an attack helicopter.*  I believe that Canada has all the appropriate approvals from the Canadian government and a paper trail to support this, however, this has the possibility to be very controversial and I'm sure [the UTC senior management] will want to be sure this has all the appropriate government approvals.  Are you aware of this program? Any concerns?

(emphasis added).

In a June 3, 2004 email to a Vice President in the Legal Department at PWC and the PWC Export Manager, forwarding all of the above, a P&W export lawyer asked: "What is the latest on this re U.S. suppliers U.S. origin technology?"  The PWC Export Manager responded: "There will be no US suppliers on this program for production.  We have an export permit for the engines for the development program from the Canadian Government but have not yet applied for engines for the production program but do not expect any issues with obtaining one when required."  In his response, the PWC Export Manager limited his answer to *production* engines and did not mention that HSC had supplied ITAR-controlled EEC software that had already been exported for use in development engines.  When the P&W export lawyer responded to the original email with the information provided by the PWC Export Manager, the P&W export lawyer did not know, and his response did not note, that HSC-modified EEC software had been exported to China for installation in the development engines.

The following year, in preparation for a June 2005 meeting with the Chinese, UTC senior management received a substantially similar briefing paper from the PWC's GM for Asia Marketing regarding the Z10 program.  In response, on April 26, 2005, an export specialist in UTC's Washington, D.C. office sent the following email to HSC: "[UTC senior management] needs to understand how it is that Pratt Canada can supply engines for the . . .[Z]-10 Chinese military attack helicopters.  I know we've discussed this before, but here's what we need from Hamilton: What goods and technology does Hamilton supply to PWC that is used on these helicopters / engines?; What is the jurisdiction and classification of those items (Commerce / 9A991?); Do we have a CJ and/or CCATS for those items?; Under what export authorization are they exported to Canada ("NLR")?"

After PWC was brought into the discussion, PWC's Export Manager responded, in pertinent part: "The Z10 helicopter, which should be referred to as the CMH rather than the Z10, is a twin engine platform that initially will be used by the Chinese Army as a military gun ship. There are plans to use the same platform and engine for a civil transport helicopter in the near future . . . . The [PWC engine] is civil certified in Canada and the US . . . . The engine is therefore classified as dual-use. There are no unique components on the engine for the CMH that are sourced from US suppliers." The author stated that the engine model was "developed using Canadian technology and use[s] . . . a . . . [Canadian-sourced] EEC." The author also noted: "we ha[d] extensive discussions in late 2004 and earlier this year with [a UTC official in Government Business Development in UTC's Washington, DC Office] on [the program]."

UTC's Washington office later asked PWC's export group for the classification of the 67C engines and any U.S.-origin content in those engines. Specifically, in a May 13, 2005 email bearing the subject "Export control/embargo," an export specialist at UTC HQ posed the following questions to PWC: "What is the correct classification of the U.S. origin content as determined by the U.S. government? . . . Who are the U.S. suppliers for this engine? . . . Do the U.S. suppliers for this engine know, at the time they export to Canada, that the ultimate destination of the engines is China?" On May 13, 2005, a PWC export project manager responded, in pertinent part:

We have self-determined the classification of the engine. The US content is clearly dual-use. All US suppliers of this engine supply parts/components that are used on the commercial Agusta AB139 helicopter and will be supplying the same parts/components for the Chinese Z10 helicopter . . . . The only difference in the engine [in the AB139 and in the Z-10] is the electronic engine control (EEC) which is procured from the US (Hamilton Sundstrand) for the Agusta application, and from a Canadian supplier for the Z10.*

The asterisk referred to a footnote, which stated:

* . . . we have procured the EEC from [HSC] for the Agusta [AB139] applications and for a limited number [of] development engines for the Z10. The only difference is that we have installed new software for the Z10 EECs. This will not be the case for production. We will use a Canadian source for this EEC for the Z10 production deliveries.

PWC and HSC did not disclose the export violations through and including 2005. Moreover, as noted above, PWC continued to "patch" the HSC software, emailing revised versions through and including June 2005 to PWC's representative in China, who downloaded the patched software into the 67C development engines.

-15-

## China Announces a Separate "Z15"as the Civil Version of the Helicopter and Solicits Proposals from Other Engine Suppliers

Ultimately, the "Z10C" civil version was never developed, and in September 2005 the Chinese provided an end use statement that identified a separate "Z15" as the civil helicopter. Specifically, in response to a supplier's request, CATIC sent PWC an end-use statement dated September 22, 2005 that stated: "It is intended that this platform form the basic version for civil and military helicopter family.  This Program has two (2) versions so far.  One version is for civil use and the other version is for military purpose.  The military version is equipped with 2 PT6C-67C engines.  In addition, to meet the general military missions, the helicopter will be used for para-public purpose, such as search & rescue, surveillance, and patrol, etc.  The civil version is Z15 helicopter . . . The development work for the civil version has already been launched and the Engine PT6C-67C has been selected."

In November 2005, CATIC and PWC signed a contract for 60 production 67C engines, with deliveries to start in mid-2006.  PWC thereafter applied to DFAIT on February 17, 2006 for a permit to export 110 production engines for the Z10 (in part to cover the 60 engine contract) and 10 development engines for the new "Z15" civil version.  PWC's submission included a cover letter and program summary.  In the cover letter, PWC acknowledged that "[a]lthough the WZ-9 was initially intended to be the engine for the military CMH program, engine program delays resulted in a decision to retain a western engine, P&WC's PT6C-67C.  Subsequently, it was decided that the PT6C-67C engine be used for all variants." ·

PWC's cover letter stressed the importance of "prov[ing] ourselves" on the military variant in order to secure the civil variant.  PWC stated that "[w]e have been working towards this opportunity for some time.  We have cultivated close business ties with China with the belief that our investment would one day bring us favorable returns.  The moment is at hand.  Our engine has been selected, and we have been awarded significant production orders."  In a section titled "Importance of the CMH Program to P&WC," PWC stated that "[b]y participating in the initial aircraft development phase, P&WC . . . secured a position as the exclusive western engine supplier for this program."  PWC added, in bold, that "If P&WC cannot deliver PT6C-67C engines for the military variant helicopter, the consequences will be severe; including the loss of its position as the engine supplier for the civil variant platform[.]"  The submission to DFAIT enclosed the 2005 end-use statement from CATIC, as well as a letter from CATIC confirming that the 67C engine had been selected for the Z15.

In early 2006, PWC began to receive information that the Z15 was heavier than initially described and that the 67C might not be selected to power it.  First, PWC read in the trade press that the Z15 might weigh as much as 7 or 8 tons; the 67C would not be suitable for a helicopter that heavy.  Then, in April 2006, PWC heard that an engine competition had been initiated for the Z15.  After failing to get satisfactory assurances regarding its status as the exclusive engine supplier, PWC wrote CATIC to remind the Chinese officials that: (1) CATIC had represented that the CMH would have two variants, military and civil; (2) the development programs for the two programs were to run in parallel; (3) PWC would be the exclusive engine supplier; (4) the export permit had been issued on that basis; and (5) if the two variants were not linked by common engines and drive trains, the Canadian government would have a problem.

The following day, in an April 26, 2006 letter, PWC's Export Manager advised DFAIT of the development, stating that "[c]urrent events now appear to contradict our belief that we would definitely be the supplier for the civil variant. Indeed, we have now received a Request for Proposal (RFP) . . . for an engine competition for the . . . Z15 helicopter program . . . . Based on the above events, we wish to advise you that the assumption that P&WC [had been] selected to power the Z15 (reference 10 development engines in our export application) is in doubt and . . . we are currently in contact with the Chinese to get further clarification. We have been told that the engine competition for the . . . Z15 is open to major helicopter engine suppliers, including P&WC[.]"

PWC and CATIC continued an exchange of correspondence in which PWC protested the RFP and sought explicit assurances of exclusivity. CATIC provided general reassurances, but no specific promises. By this time, though, it had become clear that the Z15 had evolved into a very different helicopter from the original civil variant described in AVIC II's October 2000 briefing paper. Accordingly, in June 2006, PWC's Export Manager informed DFAIT that it would no longer participate in the Z10 portion of the program.

Specifically, on June 7, 2006, PWC sent a further letter to DFAIT acknowledging that the requirements and specifications for the Z15 civil helicopter had diverged so much from the Z10 that they could no longer be considered part of a common platform. PWC stated: "in 2000 we initially embarked on this program with the intent of participating in a new class of civil medium helicopters that the Chinese were developing," which "was of keen interest to P&WC because our goal is to participate in the civil helicopter market in China." PWC had set forth their understanding that "the 'platform' architecture (comprising principally the rotors, transmission and engines) under development would serve as the basis for both civil and military versions, which would proceed in parallel," and, accordingly, their Canadian export permit application was "predicated on a common Chinese Medium Helicopter (CMH) platform," which included engines for both the civil and military variants. PWC believed "that by satisfying the current Z10 requirements we would subsequently be assured of exclusivity for the civil market," but "[r]ecent developments in the civil variant program have now called this into question." PWC stated that it was "increasingly clear . . . that the CMH platform is evolving and the commonality between the Z10 and Z15 helicopters is diminishing into two different helicopters. The concept of the 'common platform' has been eroded[.]" According to PWC, they had only "agreed to work with our Chinese customer in the short term to support the CMH platform military variant by providing our civil engine, understanding that it would be the prototype and basis for the civil version. As this is no longer the case, we wish to be forthright and make you aware of these developments[.]" PWC therefore informed the Canadian government that "[d]ue to the decision of the customer to change its requirements and re-open sourcing, we are no longer interested in participating in the Z10 portion of the program and will require a different permit for the . . . Z15 (with a different engine)."

PWC never shipped any production engines to China for the Z10 or the civil variant. The only PWC engines shipped to China were the 10 development engines.

### III.   THE SHAREHOLDER INQUIRY AND THE DISCLOSURES

UTC, PWC and HSC (collectively the "UTC Entities") failed to make a disclosure of the export violations until July 2006.

### The Shareholder Inquiry

On February 15, 2006, UTC's Investor Relations Department received an email inquiry from a non-governmental organization ("NGO") that offers advice to investors on what it believes to be socially responsible investments. The email, entitled "Investor analysis of UTC's activities in China," stated that "Pratt & Whitney, a fully owned subsidiary of UTC, reportedly participates in the development of a new combat helicopter, commonly referred to as [the] Z-10," notwithstanding that "[t]he transfer of military equipment to China is prohibited by US and EU arms embargoes." The email informed UTC that the NGO was "carrying out in-depth research into the nature and degree of the involvement of your company . . . and that such research might result in a recommendation to divest from your company." The inquiry concluded with a request "for any information you can provide about . . . the sale of military equipment as well as dual use equipment to the Chinese government in light of the arms embargo," including any "corrective" and "pro-active measures" taken "to ensure that violations that have occurred in the past (with direct or indirect involvement of the company) will not occur in the future."

At the time of the investor inquiry, UTC personnel were in the process of preparing briefing materials for UTC senior management in advance of an annual shareholders meeting in April 2006. One of the issues included in the briefing materials was the inquiry from the NGO, and more generally, PWC's helicopter programs in China. The information gathered and circulated within UTC in reaction to the shareholder inquiry eventually led to a meeting on April 13, 2006 among lawyers from UTC, P&W, PWC and UTC's Export, Licensing and Economic Sanctions Office ("ELESO"), to discuss the briefing materials and PWC's China programs. One of the action items arising out of that meeting was to determine whether UTC would need to make a disclosure regarding the export of the HSC EEC software to China. After further investigation, a subsequent meeting was held on May 1, 2006. By May 8, 2006, following a conference call among lawyers from P&W, PWC, HSC and ELESO, a collective decision was reached that a violation had apparently occurred and that UTC would make a disclosure to the State Department.

On July 17, 2006, the UTC Entities submitted to DDTC their initial disclosure letter regarding the export of the EEC software. The UTC Entities also made follow-up submissions to DDTC on August 11, 2006 and September 6, 2006.

The thrust of the disclosure letters was that none of the UTC Entities had any idea that the Chinese were developing a military attack helicopter until 2003 or 2004, and that after learning about it, and subsequently recognizing the corresponding export violations, the UTC Entities had taken swift remedial action to address the issue.

## The False Statements in the Disclosures

In the disclosures, the UTC Entities falsely claimed that the Z10 program, from its outset, was intended to be a dual-use helicopter program where civil and military applications would be developed in parallel, using the same or similar architectural structure, referred to as a "common platform." The disclosures falsely suggested that the UTC Entities were unaware that the Chinese initially intended to build a military helicopter. For example, the UTC Entities represented in the disclosure that "[t]he program was *first represented* to P&WC as a dual-use helicopter platform where civil and military applications would be developed in parallel. However, *as it unfolded*, the CMH *became* a military attack helicopter platform with a civil helicopter platform to follow." (emphasis added). The UTC Entities also falsely stated that "*[f]rom the inception of the CMH program in 2000*, AVIC II and CATIC advised P&WC that the CMH was a common helicopter program from which both civil and military variants would be developed in parallel utilizing a common platform architecture, i.e., main and tail rotors, transmission, drive shafts and engines (the 'common platform')." (emphasis added).

In fact, the Chinese initially told PWC that the first application was military and that the civil version would follow at some undetermined future date. Contemporaneous PWC documents confirmed that certain PWC employees believed that the first application would be military and that the PWC GM for Asia Marketing had specifically advised the PWC International Marketing VP and the PWC Export Manager that "[d]iscussions on PT6C-67C for Chinese Z-10 *attack helicopter* [we]re progressing smoothly." (emphasis added). It was only later, when PWC told the Chinese that an export permit would be needed for a military-first program, that the Chinese produced the briefing paper on the civil program and said that it was being developed in parallel with the military program. In an email to the PWC International Marketing VP and the PWC Export Manager, PWC's own marketing personnel questioned the "sudden appearance" of the civil program, questioned whether the timing was "real or imagined," and expressed concern "that it may have been put together to aid approval of [the] export license." But PWC turned a blind eye to those doubts and consciously avoided further inquiry, choosing instead to proceed on the basis of the revised description of the CMH program as a common platform with civil and military versions being developed in parallel.

The UTC Entities also falsely stated in the disclosures that they did not learn until several years into the project, when PWC engineers first saw the Z10 attack helicopter prototype in a hangar in China in March 2003, that: (1) the Chinese were developing an attack helicopter; and (2) this military version of the helicopter was to be the lead version. The disclosures further misstated that, even then, PWC continued to believe China's assurances that the civil program was underway – until PWC engineers saw that the second prototype was also an attack helicopter.

For example, the July 17, 2006 disclosure letter, claimed that "[s]everal years into the CMH program, P&WC became aware that a CMH military variant was to be the lead version . . . . P&WC became aware of this development sequence in March 2003 when it learned the first prototype helicopter planned for flight testing ('PT02') had a tandem seating configuration suggesting a military configuration . . . . However, AVIC II and CATIC also continued to advise P&WC that the CMH was a common development platform and the civil version was continuing under development. Despite such assurances, the next prototype, 'PT03,' which appeared in December 2003, had not only a tandem seating configuration but also other military indicia. Accordingly, in early 2004, P&WC notified HSC that the military variant of the CMH platform was leading the development process and appeared to be the first application of the common platform. P&WC and HSC determined that HSC would discontinue supplying the EEC."

In fact, PWC was told at the start that the lead version would be the military helicopter, and a contemporaneous PWC email referred to an "attack helicopter." That belief was confirmed when PWC observed the first prototype, and PWC's awareness was reflected in internal PWC documents at the time.

The interview of a former HSC Export Compliance Manager ("ECM") further confirmed that by the time the disclosures were submitted to the State Department, employees of HSC and a UTC division who were working on the disclosures had become aware that the statements concerning PWC's understanding at the inception of the program were not accurate. The former HSC ECM was among those tasked with compiling the disclosure, which was a joint disclosure by the UTC Entities. According to the former HSC ECM, he believed that PWC was not truthful in the information they provided for the disclosure. The former HSC ECM indicated that although the HSC portion of the disclosure was accurate to the facts, PWC's version of the events had been changed from the initial draft versions. According to the HSC ECM, he was uncomfortable with the changes and communicated those concerns to an HSC senior executive involved in the disclosure. The HSC executive responded that it was "PWC not us." The HSC ECM also contacted an executive in the UTC division that was working on the disclosure, an individual who had substantial experience in, and responsibility for, export control matters. According to the HSC ECM, when he raised his concerns, the executive told him that he did not believe PWC's story either but "had to document what they told him in the report."

**The Corrective Actions**

The UTC Entities' disclosures also stated: "P&W/UTC . . . will continue to maintain and implement [certain] corrective actions . . . to avoid any future occurrences of this type of violation." During the course of the investigation, the UTC Entities were asked to report on the status of the corrective actions they had identified in the Z10 disclosure letters. In a July 2010 response, UTC acknowledged that HSC had neglected to follow through on, and had overstated several of the corrective actions – corrective actions that were presented to DDTC as mitigating factors to consider in their review of the conduct.

## IV.  FAILURE TO TIMELY REPORT SALES TO AN EMBARGOED COUNTRY

PWC export personnel knew that the United States had imposed an embargo on sales or transfers of defense articles to China, that the HSC EEC software that had been modified for the initial military application required an export license from the Department of State, and that the HSC EEC software had been sold or transferred to China for installation in 67C engines for the Z10 helicopter.  HSC personnel became aware of the same facts by at least early 2004. Notwithstanding that knowledge, PWC and HSC did not timely report the sale or transfer of the modified EEC software to DDTC as required by the ITAR.  Rather, the report was not made until July 2006, several years after such sales or transfers had occurred, and nearly two and one half years after PWC's Export Manager had written that HSC could no longer participate in the program because a U.S. export license would be required and the State Department would not issue one.

# SCHEDULE  A

| PROGRAM | SOFTWARE VERSION | DELIVERY DATE TO PAWC | RELEASE STATUS | SOFTWARE TYPE / USED SOFTWARE VERSIONS | USAGE / PURPOSE | SOFTWARE REEXPORTED TO CHINA | PAWC SOFTWARE RELEASE DATE | MEANS OF EXPORT | DATE OF EXPORT | DEVELOPMENT ENGINE for PT6D/PW PT6D/PW DOWNLOAD DATE | # OF ENGINES | DOWNLOADED BY | DEVELOPMENT ENGINE for PT6D/PW PT6D/PW DOWNLOAD DATE | # OF ENGINES | DOWNLOADED BY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PT6C-67C/Z-10 based from PT6C-67C | 6101020R_01F | 30-Apr-02 | Ground/Flight | Test Version (Gas Gen Engine Software) | Used for engine pass-off ONLY for the PT6C-67C/Z-10C | NO | | | | | | | | | |
| PT6C-67C/Z-10 based from PT6C-67C | 6101022_01F | 25-Apr-02 | Test Cell Only | Test Version (Gas Gen Engine Software) | Used for engine pass-off ONLY for the PT6C-67C/Z-10C | NO | | | | | | | | | |
| PT6C-67C/Z-10 based from PT6C-67C | 5101022_01F | 8-Apr-02 | Ground/Flight | Test Version (Bus Bar Duplex Pass-off Software) | Configure current PT6C-67C software for Z10 aircraft | NO | | | | | | | | | |
| PT6C-67C/Z-10 based from PT6C-67C | 5101013 | 9-Apr-02 | Ground/Flight | Test Version | Fix errors in version 5101013 | NO | | | | | | | | | |
| PT6C-67C/Z-10 based from PT6C-67C | 5101013_01F | 15-Apr-02 | Ground/Flight | Test Version | Fix errors in version 5101013 | NO | | | | | | | | | |
| PT6C-67C/Z-10 based from PT6C-67C | 5101013_01F | 16-May-02 | Ground/Flight | Test Version | PT6C-67C/Z-10C Bus Enforcement Test Software (Other data says 19.5hr run) | YES | | E-mail * | on or about 16-May-02 | 17-May-02 | 2 engines | PAWC Personnel | 17-Apr-03 | 2 engines | PAWC Personnel |
| PT6C-67C/Z-10 based from PT6C-67C | 5101017_01F | 3-Apr-02 | Ground/Flight | Test Version | Fix errors in version 5101017 | YES | | | | | | | | | |
| PT6C-67C/Z-10 based from PT6C-67C | 5101017_01F | | Ground/Flight | Test Version | Configure current PT6C-67C software for Z10 aircraft (Modified for 1044 zone/A configuration) | YES | | E-mail * | on or about 31-Oct-02 | 02-Dec-02 | 2 engines | PAWC Personnel | | | |
| PT6C-67C/Z-10 based from PT6C-67C | 5101020 | 31-Oct-02 | Ground/Flight | Test Version | Fix errors in version 5101020 (granted run only) | NO | | also by E-mail; Downloaded by PAWC initz to engine prior to engine shipment | on or about 06-Sep-02 23-Sep-02 2 engines | | | | | | |
| PT6C-67C/Z-10 based from PT6C-67C | 5101020A_01F | 11-Mar-03 | Ground/Flight | Test Version (only) | Fix errors in version 5101020 (finished to 5000ft only) | YES | | E-mail * | on or about 11-Mar-03 | 4 engines | 2 engines | PAWC Personnel | 31-Oct-03 | 2 engines | PAWC Personnel |
| PT6C-67C/Z-10 based from PT6C-67C | 6501001 | 29-Aug-03 10-Oct-03 | Ground/Flight; Flight Test End Ground/Flight | Development Version | Configure certified PT6C-67C software for Z10 aircraft. Install release to 10K ft only | YES | | E-mail * | 04-Oct-03 | | | | | | |
| **PAWC MODIFIED SOFTWARE VERSIONS** | | | | | | | | | | | | | | | |
| PT6C-67C/Z-10 based from PT6C-67C | 6501010.01F | N/A | Development Version | Development Version | BGU Logic Disabled | YES | 18-Nov-04 | E-mail * | 17-Nov-04 | | 2 engines | PAWC Personnel | 23-Nov-04 | 2 engines | PAWC Personnel |
| PT6C-67C/Z-10 based from PT6C-67C | 6501010.01F | N/A | Ground/Flight | Development Version | For Overspeed Overtorque Test (QTV ONLY) | YES | 04-Jun-05 | E-mail * | | | | | | | |
| PT6C-67C/Z-10 based from PT6C-67C | 6501010.02F | N/A | Ground/Flight | Development Version | Optimize dynamics for installation | YES | 08-Apr-05 | E-mail* | on or about 02-Apr-05 | 11-Apr-05 | 2 engines | PAWC Personnel | 11-Apr-05 | 2 engines | PAWC Personnel |
| PT6C-67C/Z-10 based from PT6C-67C | 6501010.03F | N/A | Ground/Flight | Development Version | Optimize altitude gains (reduce oscillation at 15K ft) and start logic | YES | 22-Jun-06 | E-mail | on or about 18-Jun-06 | 09-Oct-05 | 2 engines | PAWC Personnel | 09-Oct-05 | 2 engines | PAWC Personnel |

* E-mail was the customary means of exporting software, and the same is assumed in this case.

# UNITED TECHNOLOGIES CORPORATION

THE UNDERSIGNED, Vice President, Secretary and Associate General Counsel of UNITED TECHNOLOGIES CORPORATION, a corporation duly organized and existing under the laws of the State of Delaware, having its principal office in Hartford, Connecticut (the "Corporation"), HEREBY CERTIFIES that the following is a true and complete copy of certain resolutions duly adopted by the Board of Directors of the Corporation on June 13, 2012, and that said resolutions have not been further amended, modified or rescinded, and remain in full force and effect:

WHEREAS, UTC has been engaged in discussions with the United States Attorney's Office for the District of Connecticut (the "Office") in connection with an investigation being conducted by the Office into activities regarding the CMH / Z10 helicopter program and related disclosures made by UTC and its subsidiaries Hamilton Sundstrand Corporation ("HSC") and Pratt & Whitney Canada Corp. ("PWC");

WHEREAS, the Board of Directors of UTC consents to resolution of these discussions by UTC, HSC and PWC entering into a Deferred Prosecution Agreement and its appendix, and by PWC entering into a plea agreement, all of which the Board of Directors has reviewed with counsel, relating to an Information to be filed in the United States District Court for the District of Connecticut charging: (1) PWC with willfully causing HSC to export and cause to be exported from the United States to the People's Republic of China, defense articles, that is, technical data in the form of software to test and operate the Electronic Engine Control ("EEC") for certain PWC helicopter engines that were used in the development of a Chinese "Z10" attack helicopter, without having first obtained from the United States Department of State a license or written authorization for such exports, in violation of Title 22, United States Code, Sections 2778(b)(2) and 2778(c), Title 18, United States Code, Section 2, and Title 22, Code of Federal Regulations, Sections 127.1(a) and 127.3; (2) UTC, HSC and PWC with violations of Title 18, United States Code, Section 1001 in connection with statements made in a disclosure thereof; (3) PWC and HSC with knowingly and willfully failing to inform the Directorate of Defense Trade Controls of the sale and transfer of defense articles and technical data to China, a country with which the United States maintains an arms embargo, in violation of Title 22, United States Code, Section 2778(c) and Title 22, Code of Federal Regulations, Sections 126.1(a) and (e); and (4) setting forth certain forfeiture allegations;

NOW THEREFORE, BE IT RESOLVED that Chester Paul Beach, Jr., Associate General Counsel for United Technologies Corporation, be and hereby is authorized to execute the Deferred Prosecution Agreement and its appendix on behalf of UTC substantially in the same form as reviewed by the Board of Directors at this meeting and as attached hereto as Exhibit A.

IN WITNESS WHEREOF, the undersigned has hereunto set his hand and affixed the seal of the said Corporation this 14th day of June, 2012.

An-Ping Hsieh
Vice President, Secretary and
Associate General Counsel

## <u>Certified Copy of Resolution – Hamilton Sundstrand Corporation</u>

I, Christopher Calio, the duly elected Secretary of Hamilton Sundstrand Corporation ("HSC"), a corporation duly organized under the laws of the State of Delaware, hereby certify that the following is a true and exact copy of a resolution approved by the Board of Directors of HSC at a meeting held at One Hamilton Road, Windsor Locks, Connecticut on June 18, 2012.

WHEREAS, HSC has been engaged through its counsel in discussions with the United States Attorney's Office for the District of Connecticut (the "Office") in connection with an investigation being conducted by the Office into activities regarding the CMH / Z10 helicopter program and related disclosures made by United Technologies Corporation ("UTC"), HSC and Pratt & Whitney Canada Corp. ("PWC");

WHEREAS, the Board of Directors of HSC consents to resolution of these discussions by HSC entering into a Deferred Prosecution Agreement and its appendix, all of which the Board of Directors has reviewed with counsel representing HSC, relating to an Information to be filed in the United States District Court for the District of Connecticut charging: (1) PWC with willfully causing HSC to export and cause to be exported from the United States to the People's Republic of China, defense articles, that is, technical data in the form of software to test and operate the Electronic Engine Control ("EEC") for certain PWC helicopter engines that were used in the development of a Chinese "Z10" attack helicopter, without having first obtained from the United States Department of State a license or written authorization for such exports, in violation of Title 22, United States Code, Sections 2778(b)(2) and 2778(c), Title 18, United States Code, Section 2, and Title 22, Code of Federal Regulations, Sections 127.1(a) and 127.3; (2) UTC, HSC and PWC with violations of Title 18, United States Code, Section 1001 in connection with statements made in a disclosure thereof; (3) PWC and HSC with knowingly and willfully failing to inform the Directorate of Defense Trade Controls of the sale and transfer of defense articles and technical data to China; a country with which the United States maintains an arms embargo, in violation of Title 22, United States Code, Section 2778(c) and Title 22, Code of Federal Regulations, Sections 126.1(a) and (e); and (4) setting forth certain forfeiture allegations;

NOW THEREFORE, BE IT VOTED that Chester Paul Beach, Jr., Associate General Counsel for United Technologies Corporation, be and hereby is authorized to execute the Deferred Prosecution Agreement and its appendix on behalf of HSC substantially in the same form as reviewed by the Board of Directors at this meeting and as attached hereto as Exhibit A.

IN WITNESS WHEREOF, I have hereunto signed my name as Secretary and affixed the Seal of said Corporation this __18__ day of __June__ 2012.

Christopher Calio, Secretary

Corporate Seal

**CERTIFIED COPY OF RESOLUTION – Pratt & Whitney Canada**

I, Alain C. Rondeau, the duly elected Secretary of Pratt & Whitney Canada Corp. ("PWC"), a corporation duly organized under the laws of Nova Scotia, Canada, hereby certify that the following is a true and exact copy of a resolution approved by the Board of Directors of PWC at a meeting held at Longueuil, Quebec on 21 June 2012.

WHEREAS, PWC has been engaged in discussions through counsel with the United States Attorney's Office for the District of Connecticut (the "Office") in connection with an investigation being conducted by the Office into activities regarding the CMH / Z10 helicopter program and related disclosures made by United Technologies Corporation ("UTC"), Hamilton Sundstrand Corporation ("HSC") and PWC;

WHEREAS, the Board of Directors of PWC consents to resolution of these discussions by PWC entering into a Deferred Prosecution Agreement and its appendix, and a plea agreement, all of which the Board of Directors has reviewed with counsel representing PWC, relating to an Information to be filed in the United States District Court for the District of Connecticut charging: (1) PWC with willfully causing HSC to export and cause to be exported from the United States to the People's Republic of China, defense articles, that is, technical data in the form of software to test and operate the Electronic Engine Control ("EEC") for certain PWC helicopter engines that were used in the development of a Chinese "Z10" attack helicopter, without having first obtained from the United States Department of State a license or written authorization for such exports, in violation of Title 22, United States Code, Sections 2778(b)(2) and 2778(c), Title 18, United States Code, Section 2, and Title 22, Code of Federal Regulations, Sections 127.1(a) and 127.3; (2) UTC, HSC and PWC with violations of Title 18, United States Code, Section 1001 in connection with statements made in a disclosure thereof; (3) PWC and HSC with knowingly and willfully failing to inform the Directorate of Defense Trade Controls of the sale and transfer of defense articles and technical data to China; a country with which the United States maintains an arms embargo, in violation of Title 22, United States Code, Section 2778(c) and Title 22, Code of Federal Regulations, Sections 126.1(a) and (e); and (4) setting forth certain forfeiture allegations;

NOW THEREFORE, BE IT RESOLVED that counsel Chester Paul Beach, Jr., Associate General Counsel for United Technologies Corporation, be and hereby is authorized to execute the Deferred Prosecution Agreement and its appendix and the plea agreement, on behalf of PWC substantially in the same form as reviewed by the Board of Directors at this meeting and as attached hereto as Exhibits A and B.

IN WITNESS WHEREOF, I have hereunto signed my name as Secretary and affixed the Seal of said Corporation as of this 21st day of June 2012.

Secretary

Corporate Seal

## Certificate of Counsel

We are outside counsel for United Technologies Corporation ("UTC"), Hamilton Sundstrand Corporation ("HSC") and Pratt & Whitney Canada Corp. ("PWC") in connection with a prosecution brought against them by the United States Attorney's Office for the District of Connecticut regarding the CMH/Z10 helicopter program and related disclosures made by UTC, HSC and PWC to the United States Department of State. We have thoroughly reviewed and discussed this deferred prosecution agreement, including its appendix, and the related plea agreement with PWC, with authorized representatives of UTC, HSC and PWC, who advise us that UTC, HSC and PWC understand and accept the terms thereof.


_____         Dated: __6·28·12__
JAMES COWDERY, ESQ.
Cowdery, Ecker & Murphy, LLC
Attorney for UTC, HSC and PWC